963 So.2d 180 (2007)
Christopher JONES, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. SC04-2231.
Supreme Court of Florida.
July 12, 2007.
*181 Russell L. Akins of Smith, Akins and Associates, Fort Pierce, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, and Leslie T. Campbell, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
Christopher Jones, appellant, appeals his conviction of first-degree murder and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons stated herein, we affirm the conviction, but vacate the sentence of death and reduce Jones's sentence to life imprisonment without the possibility of parole.

FACTS AND PROCEDURAL HISTORY
The evidence presented at trial indicated that on the evening of July 17, 2001, the *182 body of Hilario Dominguez was found in his home in Okeechobee County. Ashley Ennis, a long-time friend, discovered Dominguez's body and notified the police.
Okeechobee County Deputy Sheriff Sergeant Fred Bradley arrived at the scene sometime after 11 p.m. and secured the scene. Detective Daryl Lewis, another officer who arrived at the scene, noted that blood existed on both the window curtains of the front door and the wall near the kitchen area. Detective Lewis also noted that most of the blood was around Dominguez's head and that Dominguez had two defensive wounds on his left hand. Further, it was determined that Dominguez's right rear pants pocket had been turned inside out.
Dr. Charles Diggs, an associate medical examiner, performed an autopsy on Dominguez and observed several lacerations to the head and face and a single gunshot wound to Dominguez's chest. Dr. Diggs testified that the cause of death was the single gunshot wound to the chest that perforated Dominguez's heart. Dr. Diggs also testified that the trajectory of the bullet was consistent with the victim being shot at close range from the front and above. Subsequent police investigation indicated two shots had been fired, one into the victim and another recovered from Dominguez's kitchen cabinet.
Ambria Edmonds, Jones's girlfriend, testified that on the day of the murder she and Jones drove from West Palm Beach to Okeechobee to visit Jones's father. Upon reaching Okeechobee, Jones drove around while waiting for his father to return home. While driving around, Paul Rosier, Jones's cousin, stopped Jones and asked for a ride to the "camp." After arriving at the camp, Rosier exited the vehicle. Meanwhile, a woman later determined to be Ellen Cuc approached Jones and Edmonds requesting a ride but was turned down. Rosier then returned to the vehicle and all three drove to Rosier's house where Rosier exited the car again while Jones and Edmonds waited. When Rosier returned, he informed Jones and Edmonds that he had met a woman who knew someone who had money.
The three then drove to a park where they met the same woman, Ellen Cuc, who had earlier sought a ride. Rosier exited the car and talked with Cuc, and subsequently Rosier and Cuc got into the car where Cuc described to the group a "Mexican" who sold beer and cigarettes out of his home. The person she described was Hilario Dominguez. Cuc stated that she had once given Dominguez money for a ride, but he never gave her the ride, and he refused to return the money. Edmonds explained that based on the conversation in the car, she knew Dominguez was "gonna get robbed of his money." Edmonds further testified that Jones said, "I hope the man got money because I hope we're not going on a blank trip."
Cuc then directed the group to the home of the "Mexican." Upon arrival, Edmonds testified that Rosier instructed Cuc to go in and purchase something so as to determine whether there were other people there. After Cuc returned to the car, Rosier, Jones, and Edmonds approached the house pretending to want to purchase beer. Edmonds watched Rosier and Jones go up the stairs, approach the front door, and give Dominguez some money. Shortly thereafter, Dominguez opened the door to hand Rosier and Jones the beer. Jones then stuck his foot in the door, pushed it open, and struck Dominguez with a handgun. Dominguez fought with Jones but eventually fell down on his knees. All three entered the house while Jones demanded that Dominguez tell where his money was and Rosier took Dominguez's wallet from his pants pocket. During the *183 struggle, Edmonds heard a shot go off. She stated that Rosier went outside to see if any lights came on after the shot was fired. Rosier then returned and said, "Let's go." Edmonds testified that while she was grabbing tools on Jones's orders she also grabbed a rifle to disarm Dominguez so the group could "get out of [there] okay." She did as she was asked, ran down the steps, and as she did so she heard a shot go off behind her where Jones and Dominguez were struggling. She turned to see that Dominguez had been shot, but she stated that he was still alive when they left.
The group fled and while driving from the scene, Rosier struck a tree. Subsequently, the group counted out $1,500 from the wallet. They drove to Fort Pierce and checked into the Travel Inn Motel. Edmonds gave Rosier half of the money from the wallet and Rosier and Cuc left in a taxi, leaving Edmonds and Jones at the motel. Edmonds and Jones spent the night at the motel and then drove to Fort Lauderdale where Jones pawned the rifle taken in the robbery and received five dollars for it. The handgun used in the killing was stashed in Edmonds' bag. Edmonds testified that upon arriving at the motel, and to avoid getting her prints on the gun or being accused of having it in her possession, she used a towel to hide the gun under the couch in the motel room.
Later, based on information obtained by the police from Rosier and Cuc, the police arrested Edmonds and Jones at the motel. A search of the motel room uncovered a .22 caliber revolver hidden underneath the sofa cushion. Examination of the gun revealed blood, hair, and serology evidence. DNA testing revealed Dominguez's blood on the gun and a ballistics test confirmed that the gun was the murder weapon. Investigation also verified that Jones's thumb print and signature matched those located on the pawn shop ticket for the rifle.
At the Fort Lauderdale police station, Lieutenant Suttle of the Okeechobee County Sheriff's Department interviewed Jones. Jones admitted knowing a robbery was planned and that he participated in it. However, he claimed he took Dominguez's wallet as Rosier struck and shot the victim. Jones testified at trial and agreed with Edmonds' testimony until the point where he, Edmonds, Rosier, and Cuc started the drive to Dominguez's house. Jones stated that they agreed to go to Dominguez's house to buy alcohol because all of the stores were closed but that no other conversation occurred. When they arrived at the house, Cuc went in first and then came back to the car. At that point, Rosier and Edmonds went into the house, leaving Cuc and Jones in the car. Jones further testified that while in the car he heard a gunshot and saw Rosier and Edmonds running back to the car. Rosier got into the car and said, "I shot him." Rosier then backed out of the driveway, hitting a tree in the process. Jones stated that on the way to Fort Pierce, Rosier told them that he had to rob the man because he had to get out of Okeechobee and needed money. Jones admitted to forging a letter to the state's attorney, signed as "Rosier," implicating Rosier as the shooter and describing Jones as a reluctant participant in the robbery. He said he wrote the letter because he was scared. Further, Jones stated that before the robbery he had been through two back surgeries, and he claimed his back pain was so bad he could not even lift the gun used in the murder.
Jones was indicted for home invasion robbery, first-degree felony murder, and possession of a firearm by a convicted felon. Trial by jury resulted in guilty *184 verdicts for the robbery and murder. The penalty phase commenced September 17, 2003, when the State called Maria Dominguez, the victim's daughter. She testified that her father had an operable phone in the house and parked his car at the house. She also testified that Dominguez knew Cuc well and would be able to find her in the community. Jones testified at the penalty phase on his own behalf. He stated that he was twenty-four years old at the time of the offense and had primarily been raised by his grandmother due to his parents' divorce. Further, he stated that he had been convicted twice for auto theft. While proclaiming his innocence, he told the jury it did not matter to him whether he received a life or death sentence because his life was over. The jury was instructed on two aggravators: that the felony was committed during a robbery/for pecuniary gain and to avoid arrest. The jurors were given the catch-all statutory mitigating circumstance instruction and a list of nonstatutory mitigators requested by the defense. After deliberations the jury recommended death by a vote of seven to five. At the subsequent Spencer hearing, held on November 13, 2003, the defense presented Manfred Clinton White, Jones's uncle, who asked the court to spare his nephew's life.
The trial court imposed a death sentence and found two aggravators: (1) that the capital felony was committed while defendant was engaged in robbery and that the capital felony was committed for pecuniary gain (merged as one aggravator); and (2) that it was committed to avoid arrest. The court found no statutory mitigators. It rejected the statutory mitigators of age and lack of significant history of prior criminal activity. The court found seven nonstatutory mitigators: (1) lack of significant prior criminal history (very little weight); (2) minimal cooperation with law enforcement (very minimal weight); (3) broken home life (little weight); (4) the death of defendant's grandmother (little weight); (5) defendant's potential prior to his grandmother's death (some weight); (6) defendant's lack of sophistication (little weight); and (7) his good behavior during trial (little weight).

ISSUES ON APPEAL
Jones raises four issues on appeal: (1) the trial court erred in allowing hearsay testimony by State witness Ambria Edmonds; (2) the trial court erred in finding the avoid arrest aggravator; (3) the death sentence in this case is not proportional to other similar cases; and (4) Florida's death penalty statute is unconstitutional. We affirm on issues 1 and 4. However, we find error in finding the avoid arrest aggravator, and upon our proportionality review, we conclude the sentence should be reduced to life imprisonment without the possibility of parole.

GUILT PHASE
Sufficiency of Evidence
While the issue is not contested by Jones, we have a mandatory obligation to determine the sufficiency of the evidence to sustain the homicide conviction. We have outlined in detail the evidence presented at trial, and upon review, we find that evidence sufficient to sustain Jones's conviction of first-degree felony murder. Jones confessed to his involvement in the robbery, and Edmonds' testimony links Jones to Dominguez's shooting.
Admission of Evidence
Jones claims that Edmonds' testimony constituted inadmissible hearsay and its admission was sufficiently prejudicial to require a new trial. We disagree.
*185 Admissibility of evidence is within the sound discretion of the trial court, and the trial court's ruling will not be reversed unless there has been a clear abuse of that discretion. Ray v. State, 755 So.2d 604, 610 (Fla.2000); Zack v. State, 753 So.2d 9, 16 (Fla.2000); Cole v. State, 701 So.2d 845, 854 (Fla.1997). Discretion is abused only where no reasonable person would take the view adopted by the trial court. Trease v. State, 768 So.2d 1050, 1053 n. 2 (Fla.2000) (citing Huff v. State, 569 So.2d 1247, 1249 (Fla.1990)).
During the trial the State called on Edmonds to testify. During her testimony, Jones objected to any testimony by her regarding conversations between Edmonds and other codefendants Rosier and Cuc on the grounds that such testimony would be hearsay. Jones agreed that some of the testimony would be proper, but sought a continuing objection. The State argued that the testimony fell under an exception to the hearsay rule concerning the defendant's state of mind.
While we cannot agree with the State's analysis of the state of mind exception to the hearsay rule, we conclude that the admission of any objectionable portion of Edmonds' testimony constituted harmless error. We have examined all of the evidence including Edmonds' testimony. The vast majority of her testimony consisted of her factual description of the actions of the group while together, including her eyewitness account of Jones's role in the robbery and shooting. These observations constituted direct eyewitness accounts of the activities of Jones and the other members of the group and were properly admitted as relevant evidence. Otherwise her brief testimony as to the statements of the others was actually helpful to Jones since it identified Rosier as the instigator of the robbery plot and only implicated Jones in anticipating the robbery as having said, "I hope the man got money because I hope we are not going on a blank trip." This latter statement, of course, constituted an admission against interest by Jones and was admissible under that exception to the hearsay rule. The vast majority of her testimony was simply descriptive of the actions of the group during the robbery and shooting.[1] Hence, we conclude that *186 the portions of her testimony concerning Rosier's initiative in suggesting the robbery constituted harmless error at most.
We also note that while Jones's trial testimony contradicted Edmonds' testimony, the statement he gave to the police that was admitted at trial corroborates her testimony. In Jones's statement to the police, he stated, "So [Paul] say he want a rob the amigo . . . sat in front of the  the driveway and plotted out how we gonna uhm, go out the amigo and everything." Jones then goes on to describe the plan to rob Hilario Dominguez. However, in his trial testimony, Jones stated, "After the car hit the tree, we was on our way to Fort Pierce. And that's when Paul brought me up to date that  you know what I'm saying  he had to rob the man because he had to get out of Okeechobee because he need the money. . . . So that's when I  they put me up on how they  how they plotted the whole thing." The admission of this evidence of Jones's statement further convinces us that any error in the admission of Edmonds' testimony was harmless.

SENTENCING PHASE
Avoid Arrest Aggravator
We agree with appellant's contention that the trial court erred in finding and applying the avoid arrest aggravator where the proof was lacking that the dominant or only motive for the killing was to avoid arrest. This standard must be especially honored in cases where the defendant is not fleeing from the police and the victim is not a police officer. The stringent standard and degree of proof required to establish the avoid arrest aggravator in such instances was explained in Urbin v. State, 714 So.2d 411 (Fla.1998), where this Court held that the intent to avoid arrest is not present unless it is demonstrated beyond a reasonable doubt that the dominant or only motive for the murder was the elimination of witnesses. Urbin, 714 So.2d at 415 (citing Menendez v. State, 368 So.2d 1278, 1282 (Fla.1979)). This Court also explained the avoid arrest aggravator in Riley v. State, 366 So.2d 19 (Fla.1978), where we cautioned that "the mere fact of a death is not enough to invoke this factor when the victim is not a law enforcement official. Proof of the requisite intent to avoid arrest and detection must be very strong in these cases." Id. at 22. Further, in Hurst v. State, 819 So.2d 689 (Fla.2002), this Court held that the mere fact that the victim knew the defendant and could identify the defendant, without more, is insufficient to prove this aggravator. Id. at 696 (quoting Consalvo v. State, 697 So.2d 805, 819 (Fla. 1996) (stating that mere speculation on the part of the State that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator)); see also Davis v. State, 604 So.2d 794, 798 (Fla.1992); Geralds v. State, 601 So.2d 1157, 1164 (Fla.1992).
Applying this strict standard, we conclude there is simply no competent, substantial evidence supporting a finding that Jones shot and killed Dominguez in order to eliminate him as a potential witness. Further, there is no direct evidence of *187 what occurred immediately preceding Jones shooting the victim. At most, the testimony of Edmonds suggests that the first shot was fired wildly during the victim's struggle with Jones and the second fatal shot was fired as Jones was attempting to disengage himself from the victim and flee. The speculation relied upon by the State is simply insufficient to meet the heavy burden we have imposed in order for this aggravator to be established. For example, we have held the fact that the victim knew at least one of the robbers is insufficient to prove this aggravator. See, e.g., Geralds, 601 So.2d at 1164. Further, we conclude that the fact that the victim had a telephone and a vehicle are circumstances present in many crimes, but those circumstances tell us virtually nothing about the reasons for the shooting. Accepting Edmonds' testimony as relied upon by the State, we can conclude that Jones inflicted the fatal wound, but such evidence does not provide the motive or reason for the shooting. We conclude that these circumstances are insufficient to meet the high standards we have set to establish the existence of this aggravator.[2]
Proportionality
We further conclude that the death sentence must be vacated in this case because the imposition of such a sentence would not be proportionate based on the existence of the single aggravator that remains. Under these circumstances, we cannot conclude that this case falls in the extraordinary category of the most aggravated and least mitigated of homicides as our case law requires in order to sustain the penalty of death. See Kramer v. State, 619 So.2d 274, 278 (Fla.1993).
We have held that appellate review of a case in which the death sentence has been imposed depends not on a comparison of the number of aggravating factors to the number of mitigating factors, but rather, on the totality of the circumstances compared to other cases. See Boyd v. State, 910 So.2d 167, 193 (Fla.2005) (citing Pearce v. State, 880 So.2d 561, 577 (Fla. 2004)); Urbin, 714 So.2d at 416 (citing Porter v. State, 564 So.2d 1060, 1064 (Fla. 1990)); Terry v. State, 668 So.2d 954, 965 (Fla.1996). We review and consider all the circumstances in a case relative to other capital cases when deciding whether death is a proportionate penalty and to ensure uniformity. See Johnson v. State, 720 So.2d 232, 238 (Fla.1998); Urbin, 714 So.2d at 416-17.
We have approved the finding of one aggravator based essentially upon the fact that the murder occurred during the course of the robbery. The court also found nonstatutory mitigation of (1) criminal history ("very little weight"); (2) minimal cooperation with law enforcement (very minimal weight); (3) broken home life (little weight); (4) death of defendant's grandmother (little weight); (5) defendant's potential prior to his grandmother's death (some weight); (6) lack of sophistication (little weight); (7) good behavior during trial (little weight). We are left with a case with one aggravator  the murder occurred during a robbery for pecuniary gain  and the mitigation found by the trial court.
The facts in this case are very similar to those in other robbery cases where we have concluded that the circumstances were not sufficiently compelling to mandate a death sentence. See, e.g., Terry, *188 668 So.2d at 965 (while it was clear that the murder occurred during a robbery, the circumstances surrounding the actual shooting were unclear and the evidence supported the theory of a "robbery gone bad"); Sinclair v. State, 657 So.2d 1138, 1142 (Fla.1995) (circumstances of robbery and finding of one valid aggravator insufficient to sustain death sentence); Thompson v. State, 647 So.2d 824, 827 (Fla.1994) (same).
The Terry court concluded that the circumstances of that case did not meet the test laid down in State v. Dixon, 283 So.2d 1, 8 (Fla.1973), "to extract the penalty of death for only the most aggravated, the most indefensible of crimes" and vacated the sentence of death. Terry, 668 So.2d at 966 (quoting Dixon, 283 So.2d at 8). The Terry court agreed that the murder took place during the course of a robbery. However, the court could not determine the specific circumstances surrounding the actual shooting. The court noted that there was evidence that this was a "robbery gone bad" but then went on to say that "[i]n the end, though, we simply cannot conclusively determine on the record before us what actually transpired immediately prior to the victim being shot." Terry, 668 So.2d at 965.
Terry also mirrors the instant case when comparing the aggravators and mitigators. As in the instant case, the Terry court found that the capital felony was committed during the course of an armed robbery/for pecuniary gain. Id. The trial court had previously found the statutory aggravator of a prior violent felony or a felony involving the use or threat of violence to the person. Id. This Court found that the second aggravator "[did] not represent an actual violent felony previously committed by Terry." Id. We further held that the case was factually similar to robbery-murder cases like Sinclair and Thompson. Id. at 966.
In Thompson, the defendant walked into a Subway sandwich shop in Pensacola, conversed with the attendant and then shot him in the head. 647 So.2d at 825. Thompson was arrested moments after the shooting, and $108 was found on his person. Id. The trial court found four statutory aggravators: (1) that Thompson committed the murder while under sentence of imprisonment; (2) that he committed the murder during the course of a robbery; (3) that he committed the murder to eliminate a witness; and (4) that he committed the murder in a cold, calculated, and premeditated manner. Id. at 826 n. 1. As mitigators the trial court found: (1) Thompson was a good parent and provider; (2) he had exhibited no violent propensities prior to the killing; (3) he received an honorable discharge from the Navy; (4) he maintained regular, gainful employment; (5) he was raised in church; (6) he possessed some rudimentary artistic skills; and (7) he had been a good prisoner and has not been a discipline problem. Id. at 826 n. 2. On appeal this Court struck three of the four aggravators including the aggravator that Thompson committed the robbery to eliminate a witness. Id. at 826-27. We then went on to conclude that the remaining single aggravating circumstance was insufficient to support the ultimate penalty of death. Id. at 827.
The Sinclair trial court, as in this case, merged as one circumstance the aggravating circumstances of murder committed for pecuniary gain and murder while engaged in the commission of a robbery. 657 So.2d at 1140 n. 1. In vacating the sentence of death, this Court compared this case to Thompson, in which the only valid aggravator was that the murder was committed in the course of a robbery. Sinclair, 657 So.2d at 1142. The court *189 noted that the mitigators in Sinclair were not as significant as in Thompson, but found that there were mitigators nonetheless and held that death was not a proper sentence. Sinclair, 657 So.2d at 1142.
In the present case, as in Terry, Thompson and Sinclair, there is little or no evidence of what happened immediately before the victim was shot. Further, as with many cases of murders during a robbery there is no evidence of premeditation. See, e.g., Rembert v. State, 445 So.2d 337, 340 (Fla.1984) ("This is a classic example of a felony murder, [where] very little, if any, evidence of premeditation exists.") As in these similar cases, we conclude the single aggravator is insufficient to justify a sentence of death. Further, even with the instructions on multiple aggravators, the jury only recommended death by a vote of seven to five, one vote away from a life recommendation. We do not diminish the tragic and inexcusable loss of life of the victim, but we must reserve the death penalty for the most egregious of murders. Accordingly, we find that the death sentence is disproportionate in this case and remand for implementation of a life sentence without possibility of parole.

RING[3]
Jones argues that Florida's death penalty statute is unconstitutional because section 775.082, Florida Statutes (2001), provides that the imposition of the death penalty is premised upon the findings of the court. Since we are vacating the sentence of death in this case, Jones's argument is now moot.

CONCLUSION
Because we find that there is sufficient evidence to uphold Jones's conviction for first-degree felony murder, but insufficient evidence to maintain the avoid arrest aggravator, we affirm the conviction but vacate the sentence of death and reduce appellant's sentence to life imprisonment without the possibility of parole.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] For example, Edmonds testified:

Q So at that point are all four of you in the car together?
A Yes.
Q Where is everyone seated?
A Chris is in the passenger side. Paul is driving. I'm behind Chris and Ellen is behind Paul.
Q And at that point did Paul begin driving somewhere?
A No, he  after  it was like, uh, Ellen was telling Paul that, uh, he  she knew the Mexican man and Paul was like, you know, well, how much money does he keep on him? And, uh, is it in the house or, you know, that  that 
Q Is that conversation taking place while the four of you were in the vehicle and it is just sitting still?
A Yes, sir.
Q What other specific questions do you recall Paul or anyone asking about this man or his money or things of that nature?
A Uh, Paul is asking her where does he live. Uh, then she stated that, you know, he lived in Dewberry Gardens and that she needed a hundred dollars to get back to Iowa. She said that he took some of her money that she gave him to take her somewhere and he didn't give it back to her. So, I believe that she was upset with him, you know, so that's all. She just wanted her hundred dollars to get back to Iowa. So then Paul was like, well, we're gonna go over there. And she said, "Okay."
Q Did someone start driving then?
A Paul began driving and when we started driving, uh, they stopped at a gas station. I got out to go use the restroom and I don't know what was said at the gas station, but I know when I got out and came back, Paul was asking Ms. Cuc, where, where does the man live.
Q This whole time this conversation was taking place, was Chris Jones in the car with you?
A Yes, sir.
Q Did he partake in any of the discussions about this man or this money?
A I believe he said that, "I hope the man got money because I hope we're not going on a blank trip."
Q Do you recall anything else that Chris Jones may have said during that conversation.
A No.
[2] Here, the record reflects that before the penalty phase began, the trial court actually ruled that there had been insufficient evidence presented during the guilt phase to support that witness elimination was the sole or dominant motive for Dominguez's homicide. However, the court allowed the State to address the issue again during the sentencing.
[3] Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).