PER CURIAM.
Kevin Jerome Scott, who was twenty-two years old at the time of the crime, was convicted of first-degree murder, attempted armed robbery, and aggravated battery due to his role in the June 30, 2007, coin laundry robbery, which resulted in the shooting death of Kristo Binjaku. Scott appeals his first-degree murder conviction and sentence of death. We have mandatory jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons more fully explained below, we affirm Scott’s conviction but vacate his death sentence because we conclude that imposing a sentence of death would not be a proportionate punishment in this case. Accordingly, we remand for imposition of a sentence of life imprisonment without the possibility of parole.
FACTS AND PROCEDURAL HISTORY
The Guilt Phase
The evidence presented at trial established that Scott, together with his friend and codefendant Desi Bolling, who was twenty-one at the time, planned a robbery of the Binjaku Crystal Coin Laundry, a coin laundry on the south side of Jacksonville. On June 30, 2007, approximately two weeks after Scott and Bolling planned the robbery, Bolling contacted Scott by phone, and the two men met at a gas station near the coin laundry. Scott and another man, previously unknown to Boll-ing and identified only as “Miami,” entered Bolling’s car.[1]
While inside the vehicle, the three men discussed the coin laundry, during which Scott asked Bolling if he had a firearm. At the time, Bolling had been attempting to sell a .40-caliber Glock handgun, had the gun in his trunk, and provided it to Scott. Bolling expected to sell the gun to Scott in exchange for money gained from the robbery. Miami brought his own firearm but mentioned that it was not loaded. Scott did not indicate to Bolling whether it was Scott’s plan to shoot anyone. Following this discussion, Scott and Miami exited the vehicle and informed Bolling that they *926 would call him in ten minutes. Bolling drove to a nearby apartment complex to await the call and socialize with friends.
After Scott and Miami exited Bolling’s vehicle, they approached the coin laundry’s side entrance. Both men covered their faces with white t-shirts to mask their identities. Scott then entered the coin laundry while Miami apparently remained at the side entranceway. As Scott entered, he hit Gentian Koci, who was sitting in a chair next to the side door, on the back of the head with the butt of his gun. Binja-ku, who at the time was sitting on the floor next to Koci working on a broken machine, got up and told the intruders that he did not have any money and to go away. Scott then pointed his gun at Binjaku and fired one fatal shot to Binjaku’s face. Scott and Miami fled the scene, and Xhulio Binjaku, the murder victim’s son, called 911 to report the crime. Eyewitnesses identified both intruders as black males.
Following the attempted robbery, Scott and Miami ran to a nearby high school. John Holsenbeck, who was at the pool of an apartment complex across the street, testified that after he heard the gunshot, he observed a black male wearing a white t-shirt run by the swimming pool from the direction of the coin laundry and toward the high school. Holsenbeck could not identify the individual but thought the man resembled someone he had spoken to earlier that day at the intersection next to the coin laundry. He relayed his observations to police at the scene. Approximately three weeks later, Holsenbeck identified from a photo lineup two individuals, one of whom was Scott, who looked like the person he had talked to earlier in the day.
Approximately ten to fifteen minutes after Scott and Miami had exited Bolling’s vehicle, Bolling received a call from Scott. At Scott’s request, Bolling drove to the nearby high school and picked up Scott and Miami. At trial, Bolling testified that Scott and Miami were sweating, hysterical, and tired. Bolling recalled Scott saying that he had “shot the guy” because the victim “had jacked the buck.” Bolling understood that comment to mean that Bin-jaku had refused to give Scott any money. At the time, Bolling did not realize that the gunshot was fatal to the victim.
Bolling, Scott, and Miami then went back to the apartment complex where Boll-ing had previously been socializing. One witness, Lawrence Wright, stated that Scott appeared nervous, shaky, sweaty, and paranoid. Bolling testified that Scott explained to everyone that he was sweaty because he had been having sex. Bolling then left the apartment complex to drop off Scott and Miami at separate locations. Scott gave the murder weapon back to Bolling, at which point Bolling observed that one bullet was missing. The next day, Bolling discovered that the gunshot to Binjaku was fatal.
In an effort to secure a $20,000 reward promised by local businessmen, Wright volunteered the information that Bolling, Scott, and another individual had acted suspiciously on the night of the murder and that Bolling had been trying to sell a handgun prior to the date of the murder. Wright agreed to wear a recording device and to purchase the handgun from Bolling. When Bolling sold the murder weapon to Wright, Bolling told Wright to be careful because the gun had “a body on it.” Law enforcement obtained the weapon from Wright and found that it matched a cartridge case recovered from the scene of the murder.
Bolling was subsequently arrested and charged with murder and attempted armed robbery. After initially denying any involvement, Bolling approached law enforcement, acknowledged his complicity, identified Scott as the killer, and agreed to *927 cooperate.[2] The next day, on October 1, 2007, Scott was arrested for an unrelated possession-of-cocaine offense at the intersection adjacent to the coin laundry. At trial, testimony regarding Scott’s arrest and subsequent jailing was excluded following a defense motion in limine. However, testimony as to Scott’s general “contact” with law enforcement was presented at trial for the limited purpose of demonstrating that Scott was in the south side area where the crime was committed and not, as the defense would seek to show, always at his north side residence.
Following Scott’s arrest, law enforcement arranged for Scott and Bolling to be housed in the same area at the jail. Boll-ing agreed to wear a wire and to record a conversation with Scott. Both Bolling and lead Detective Travis Oliver testified that they recognized the voice on the recording as belonging to Scott. The conversation was played at trial, but because much of the recording was inaudible, a prepared transcript was provided to the jury as an aid.
In the recording, Bolling asked Scott about the night of the shooting. The ensuing conversation contained statements from Scott about the circumstances surrounding the attempted robbery and murder, including: (1) Scott’s identification of three people in the coin laundry, one of whom was bending down by a machine; (2) Scott’s explanation that an accomplice from Miami was behind him outside with an unloaded gun and was shaken by the events; (3) Scott’s acknowledgement that he was masked; (4) Scott’s claim to have hit one man in the head; and (5) Scott’s claim that he shot another man after he told Scott to get out of the store and, in Scott’s words, “grabbed a chair like he was going to hit” Scott.
At trial, Scott presented four alibi witnesses: Scott’s neighbors, Quartx Barney, Tony Paige, and Ray Washington, and the daughter of Scott’s girlfriend, Regina Cor-ley, all of whom testified that Scott was present at the birthday party of Barney’s child at the time of the crime, that Scott was cooking and helping with the children, and that he never left the party. The witnesses also testified that Scott lived with his girlfriend, Nicole Corley, on Jacksonville’s north side, took care of her children, and generally never left the house.
Through cross-examination, the prosecutor suggested that the four had together agreed to provide a false alibi for Scott. Specifically, the prosecutor asked each witness about the circumstances under which the four communicated the story to one another and why they waited nearly two years before coming forward. The prosecutor also asked Barney, Paige, and Washington why Scott was on the south side when he came into contact with a police officer in October.
The State called Scott’s girlfriend, Nicole Corley, as a rebuttal witness and asked her if Scott had a friend identified as “Miami.” She testified that she had heard Scott refer to someone by that name but did not know who he was, and she answered that “there’s a lot of Miamis in Jacksonville.” Corley also testified that she lived with Scott on the north side, that she had three children — one with Scott— and that Scott always stayed home and cared for the children. The prosecutor asked her why Scott came into contact with a police officer at the intersection next to the coin laundry in October, and she responded that he briefly left the house around that date after the two had a disagreement.
*928 The jury found Scott guilty as to all counts. As to his conviction for first-degree murder, the jury found Scott guilty, by special verdict, under both premeditated and felony-murder theories.
The Penalty Phase
At the penalty phase, the State presented two victim impact witnesses: Malvina Binjaku, the murder victim’s daughter, and Sally Trammel, a family friend who taught Malvina, both of whom read from prepared statements.
To establish the existence of mitigation, Scott presented testimony from his relatives, friends, and former employers before testifying himself. Scott’s mother testified that Scott had some trouble with the law, but that it was a result of Scott hanging around with the wrong crowd. She testified that Scott’s father had not been involved in his life and described Scott’s interaction with his father as brief and disappointing to Scott. She also testified that when Scott was three, she had a brief marriage in which she was physically abused. However, she said that Scott only heard the abuse and was not around to see it. Scott’s mother also testified that Scott had never been violent.
The prosecution cross-examined Scott’s mother as to Scott’s prior convictions and presented rebuttal testimony from six police officers or former police officers who indicated that Scott was accused of burglary and battery with assault as a minor in 1999 and was arrested for three burglaries in 2008; reckless driving, driving with no valid driver’s license, and felony fleeing in 2005; possession of crack cocaine in 2005; and marijuana possession in 2006. These arrests and others resulted in a conviction for dealing in stolen property in 2003; convictions for felony fleeing, reckless driving, driving with no valid driver’s license, and possession of cocaine in 2005; convictions for resisting an officer without violence and driving while license suspended or revoked in 2005; a conviction for no valid driver’s license in 2006; and a final conviction for grand theft in 2006.
Scott testified on his own behalf, during which he did not admit to guilt. Instead, Scott testified that he had learned a lot and that he could be a productive person and contributing family member from prison. Following the presentation of penalty-phase testimony, the jury recommended the death penalty by a vote of nine to three.
The Spencer[3] Hearing
The trial court subsequently conducted a brief Spencer hearing. The State did not introduce any additional evidence. Defense counsel discussed with the trial court Scott’s presentence investigation report and then read into the record two letters from members of Scott’s family. The first letter was written by Scott’s father, Kevin Robinson, who expressed regret that due to drug dependency, he was never able to be a part of Scott’s life. The second letter was written by Scott’s aunt, Lavonda Armstrong, who recounted that Scott was still a sweet and mindful individual whose life should be spared. Scott chose not to testify-
The Sentencing Order
Subsequent to the Spencer hearing, the trial court followed the jury’s recommendation and sentenced Scott to death. In pronouncing Scott’s sentence, the trial court determined that the State had proven beyond a reasonable doubt the existence of two statutory aggravating circumstances: (1) Scott was previously convicted of a felony involving the use or threat of violence to some person; and (2) the murder was committed while Scott was engaged in an attempt to commit the crime *929 of armed robbery. The trial court found that the result of the jury’s guilt-phase verdict — finding Scott guilty of the aggravated battery committed on Gentian Koci and the attempted armed robbery of the coin laundry — supported the aggravators and assigned to each “great weight.”
The trial court rejected two statutory mitigators,[4] but found that the evidence established nine nonstatutory mitigators, which are set forth in our proportionality discussion. With respect to Scott’s convictions for attempted armed robbery and aggravated battery, the trial court sentenced Scott to twenty-five years’ and fifteen years’ imprisonment, respectively.
On direct appeal, Scott raises five claims.[5] In addition to addressing each of these claims, we also conclude that based upon the testimony of codefendant Bolling, the testimony of eyewitnesses, and Scott’s own inculpatory statements, there was sufficient evidence that “a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Simmons v. State, 934 So.2d 1100, 1111 (Fla.2006) (quoting Bradley v. State, 787 So.2d 732, 738 (Fla.2001)).
ANALYSIS
The Prosecutor’s Guilt-Phase Closing Argument
Scott first claims that the trial court erred in denying his motion for mistrial when the State impermissibly suggested to the jury that the burden was on the defendant to prove the identity of the person whose voice was captured on the jailhouse recording. Although Scott moved for a mistrial following the presentation of closing arguments, he did not contemporaneously object to this alleged error, and, in failing to do so, did not preserve this issue for appellate review. See Nixon v. State, 572 So.2d 1336, 1340-41 (Fla.1990) (holding that a motion for mistrial raised after closing arguments, absent contemporaneous objection to the alleged error, is insufficient to preserve the issue of improper prosecutorial argument for appeal); see also Poole v. State, 997 So.2d 382, 389-90 (Fla.2008) (concluding that the failure to raise contemporaneous objections to the prosecutor’s comments waived any claim concerning the comments for appellate review notwithstanding a subsequent motion for mistrial). “Unob-jected-to comments are grounds for reversal only if they rise to the level of fundamental error.” Merck v. State, 975 So.2d 1054, 1061 (Fla.2007). Fundamental error is error that “reaches down into the validity of the trial itself to the extent that a verdict of guilty ... could not have been obtained without the assistance of the alleged error.” Poole, 997 So.2d at 390 (quoting Card v. State, 803 So.2d 613, 622 (Fla.2001)).
*930 With this claim, Scott argues that the State’s commentary recognized that Scott had an obligation to present evidence to refute testimony from the State’s witnesses stating that the voice captured on the recording matched Scott’s. We disagree. In Jackson v. State, 575 So.2d 181, 188 (Fla.1991), this Court explained that the State cannot comment on a defendant’s failure to produce evidence to refute an element of the crime. In Gore v. State, 719 So.2d 1197, 1200 (Fla.1998), we further explained impermissible burden shifting:
The standard for a criminal conviction is not which side is more believable, but whether, taking all the evidence into consideration, the State has proven every essential element of the crime beyond a reasonable doubt. For that reason, it is error for a prosecutor to make statements that shift the burden of proof and invite the jury to convict the defendant for some reason other than that the State has proved its case beyond a reasonable doubt.
However, “[a] prosecutor’s comments are not improper where they fall into the category of an ‘invited response’ by the preceding argument of defense counsel concerning the same subject.” Walls v. State, 926 So.2d 1156, 1166 (Fla.2006). Accordingly, under the “invited response” doctrine, the State is permitted “to emphasize uncontradicted evidence for the narrow purpose of rebutting a defense argument since the defense has invited the response.” Caballero v. State, 851 So.2d 655, 660 (Fla.2003).
In this case, we conclude the prosecutor’s remarks were an invited response to Scott’s suggestion that Bolling could have scripted the recording in an effort to frame Scott for the murder. During his closing argument, defense counsel insinuated that Bolling had scripted the jailhouse conversation with a third party in order “to go home” because Bolling was the actual killer. Although the prosecutor could have used a better choice of words to address Scott’s alibi presentation, the prosecutor’s comments, when considered in context, were made in direct response to Scott’s closing argument. In fact, the prosecutor specifically referenced the alternative theory Scott proposed — that Bolling had scripted this conversation with someone other than Scott. Moreover, the prosecutor’s comments did not explicitly mention that Scott bore the burden of proving it was not his voice on the tape. Cf. Gore, 719 So.2d at 1200-01 (finding prosecutor’s statement, that “[i]f you believe [the defendant’s] lying to you, he’s guilty,” enunciated “an erroneous and misleading statement of the State’s burden of proof because it improperly asked the jury to determine whether Gore was lying as the sole test for determining the issue of his guilt”).
Instead, the prosecutor’s commentary, which stated that Scott’s alibi witnesses were never asked about whether the recorded voice was Scott’s, went no further than to point out the lack of evidence to support Scott’s alternative theory and that the State’s evidence on this matter was uncontradicted. See Poole, 997 So.2d at 390 (concluding that a prosecutor’s remark regarding a lack of evidence that someone else could be responsible for causing injury to the victims was a proper, invited response to Poole’s denial of guilt for only the crimes involving injury). Thus, the State’s comments did not constitute impermissible burden-shifting, but were rather invited responses to Scott’s own suggestion that Bolling could have scripted the recording in an effort to frame Scott for the murder. Accordingly, we conclude that the comments did not constitute reversible error, and Scott is not entitled to relief on this claim.
*931 Evidence of Scott’s Unrelated Drug Offense
Next, Scott argues that the trial court erred in denying his motion for mistrial following the State’s cross-examination of defense alibi witness Ray Washington, during which Washington stated that Scott had been incarcerated for an unrelated drug charge. Specifically, Scott contends that Washington’s testimony had a negative impact on the jury’s view of his character and resulted in undue prejudice. While we agree with Scott that Washington’s statements were improper, we disagree that the trial court erred by not granting a mistrial under these circumstances.
The facts underlying this claim are as follows. Shortly after Bolling informed police that Scott was the shooter, Scott was arrested and jailed for an unrelated possession-of-cocaine offense. Consequently, the State sought to introduce evidence that when Scott was arrested, he was in the south side area where the murder was committed and not, as the defense attempted to show, always at his north side residence. Scott filed a motion in limine to exclude the evidence of the arrest. Following a hearing on this motion, the trial court excluded the nature of Scott’s arrest but allowed the State to present testimony that the officer came into “contact” with Scott at that location.
During the State’s cross-examination of Washington, the prosecutor questioned her as to what year she had spoken to someone about Scott’s presence at a party. Washington responded, “Yes. It was after he got incarcerated. He had went to jail on a drug charge. Then [Scott’s girlfriend] called down there and they say he had a case pending and then that’s when y’all start coming out.”
Defense counsel did not contemporaneously object, but shortly thereafter, when witness Washington was dismissed, counsel moved for a mistrial, citing the prejudicial effect of Washington’s testimony. The trial court denied the motion, and defense counsel expressly declined the issuance of a curative instruction even though the trial court stated that it would have given such an instruction if so requested.
We acknowledge that counsel failed to contemporaneously object and that, generally, a fundamental error analysis would apply. Here, however, the trial court previously ruled upon this issue in a motion in limine and would have presumptively sustained an objection. Rather than objecting, counsel moved for a mistrial shortly after Washington’s improper testimony. Therefore, under the facts of this case, we review the trial court’s ruling on the motion for mistrial for an abuse of discretion. See Smith v. State, 998 So.2d 516, 526 (Fla.2008).
The granting of a motion for mistrial is not based on whether the error is “prejudicial.” Rather, the standard requires that a mistrial be granted only “where an error is so prejudicial as to vitiate the entire trial,” England v. State, 940 So.2d 389, 402 (Fla.2006), such that a mistrial is “necessary to ensure that the defendant receives a fair trial,” McGirth v. State, 48 So.Sd 777, 790 (Fla.2010). “It has been long established and continuously adhered to that the power to declare a mistrial and discharge the jury should be exercised with great care and caution and [it] should be done only in cases of absolute necessity.” England, 940 So.2d at 402 (quoting Thomas v. State, 748 So.2d 970, 980 (Fla.1999)). Therefore, “[i]n order for the prosecutor’s comments to merit a new trial, the comments must either deprive the defendant of a fair and impartial trial, materially contribute to the conviction, be so harmful or fundamentally tainted as to require a new trial, or be so inflammatory that they might have influenced the jury to *932 reach a more severe verdict than that it would have otherwise.” Salazar v. State, 991 So.2d 364, 372 (Fla.2008) (quoting Spencer v. State, 645 So.2d 377, 383 (Fla.1994)).
In the present case, based on the trial court’s prior ruling on the motion in limine, it was certainly improper for witness Washington to discuss the underlying nature of Scott’s collateral drug arrest. However, from the record, Washington’s reference to the details of Scott’s unrelated charge appeared to be spontaneous and fleeting, and it bore no connection to the charges for which Scott was being tried. Further, this witness was called by Scott himself, and there is no indication that the State intended to elicit this statement. In fact, the State did not again mention to the jury Washington’s solitary reference to the nature of this collateral charge. Moreover, the trial court implicitly recognized that this was error and asked defense counsel whether the court should issue a curative instruction, which defense counsel declined.
In light of the foregoing, we conclude that Washington’s isolated reference to Scott’s unrelated drug charge was not so prejudicial as to vitiate the entire trial. See Jackson v. State, 25 So.3d 518, 528-29 (Fla.2009) (finding a witness’s comment regarding fact that defendant always carried a gun, the mention of which was previously excluded by defense motion in limine, was improper but did not warrant a mistrial because defense counsel declined a curative instruction and witness’s gun reference was brief), cert. denied, — U.S. -, 130 S.Ct. 3420, 177 L.Ed.2d 332 (2010). Accordingly, the trial court did not abuse its discretion in denying Scott’s motion.
The Admission of Scott’s Recorded Jailhouse Statements
Scott also asserts that the trial court erred in admitting the recorded jailhouse conversation between Bolling and himself that took place following his arrest on the unrelated drug charge. Scott does not argue on appeal that under the Fifth Amendment, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), warnings were necessary prior to the recorded conversation; instead, he argues that the statements were obtained in violation of his Sixth Amendment right to counsel.[6] We disagree.
The record reflects that after codefen-dant Bolling identified Scott as the shooter, law enforcement issued an “intelligence bulletin” identifying Scott as Bolling’s accomplice in the murder and calling for his arrest. The next day, Scott was arrested and jailed for an unrelated drug offense, and the intelligence bulletin was cancelled. Scott’s statements to Bolling discussing the circumstances surrounding the shooting and attempted robbery were recorded after he was jailed for the drug charge but before he knew that he was considered a suspect in the murder.
Prior to trial, Scott filed a motion to suppress the statements obtained as a result of the recorded conversation between Scott and Bolling. Scott argued that the statements were obtained while he was *933 “in-custody at the time of his questioning by” Bolling, and the recording violated his “constitutional rights.” At trial, Scott argued for suppression based on the assertion that the tape was inaudible and the transcript was unreliable. The trial court denied Scott’s oral motion without addressing Scott’s written argument that his constitutional rights had been violated.
In resolving this claim, we initially note that the United States Supreme Court has drawn a distinction between the Sixth Amendment right to counsel and the Fifth Amendment right against self-incrimination:
The former arises from the fact that the suspect has been formally charged with a particular crime and thus is facing a state apparatus that has been geared up to prosecute him. The latter is protected by the prophylaxis of having an attorney present to counteract the inherent pressures of custodial interrogation, which arise from the fact of such interrogation and exist regardless of the number of crimes under investigation or whether those crimes have resulted in formal charges.
Atizona v. Roberson, 486 U.S. 675, 685, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). Along the same lines, this Court has explained that unlike the Fifth Amendment right to counsel, “the Sixth Amendment right to the assistance of counsel is ‘offense specific’ and applies only to the offense or offenses with which the defendant has actually been charged, and not to any other offense he may have committed but with which he has not been charged.” Ibar v. State, 938 So.2d 451, 470 (Fla.2006). The Sixth Amendment right is meant “to protect unaided laymen at critical confrontations with the State” and therefore “attaches at the earliest of the following points: formal charge, preliminary hearing, indictment, information, or arraignment.” Smith v. State, 699 So.2d 629, 638 (Fla.1997).
In this case, it is undisputed that the recorded conversation between Bolling and Scott was obtained prior to any of the points at which the Sixth Amendment right to counsel attaches. Scott had not been formally accused of the murder, nor was he even aware that law enforcement considered him a suspect. Scott nevertheless argues that the right attached earlier in his case because after Bolling communicated his intent to cooperate with law enforcement and an intelligence bulletin called for Scott’s arrest, the process shifted from “an investigatory process to an accusatory one.” In support of his argument, Scott points to the following language from the United States Supreme Court:
[W]hen the process shifts from investigatory to accusatory — when its focus is on the accused and its purpose is to elicit a confession — our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer.
Escobedo v. Illinois, 378 U.S. 478, 492, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).
Subsequent decisions by the Supreme Court make clear that, “[although Escobe-do was originally decided as a Sixth Amendment case, ‘the Court in retrospect perceived that the prime purpose of Escobedo was not to vindicate the constitutional right to counsel as such, but, like Miranda, to guarantee full effectuation of the privilege against self-incrimination.’ ” Moran v. Burbine, 475 U.S. 412, 429-30, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (quoting Kirby v. Illinois, 406 U.S. 682, 689, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972)). Therefore, Escobedo no longer supports the argument that the Sixth Amendment right to counsel applies prior to the initiation of adversary judicial proceedings. *934 See Moran, 475 U.S. at 429, 106 S.Ct. 1135.[7]
Here, although Bolling had provided a statement implicating Scott, law enforcement did not formally accuse Scott based solely on the potentially unreliable confession of a codefendant seeking a lesser sentence, but sought to further investigate by obtaining independent, recorded evidence of guilt. Only after obtaining the recording did the State formally accuse Scott.[8] While Scott had been formally charged in the unrelated drug crime by the time of the recording, the right to, counsel under the Sixth Amendment is offense-specific and therefore inapplicable to the investigation in this case. See Ibar, 938 So.2d at 470 (determining that the defendant’s Sixth Amendment right to counsel had not been triggered at the time of a live lineup because the defendant had only been arrested on unrelated charges); Durocher v. State, 596 So.2d 997, 999-1000 (Fla.1992) (determining that the Sixth Amendment right to counsel was not implicated where the defendant was awaiting sentencing on an unrelated murder charge and had not yet been charged with the crime to which he confessed). Accordingly, the trial court did not err in denying Scott’s motion to suppress.
Proportionality
We finally address Scott’s claim that the death penalty is disproportionate. Specifically, Scott contends that the nature of the prior violent felony in his case does not elevate the murder of Kristo Binjaku to one permitting a sentence of death. After considering the totality of the circumstances in this case, we agree with Scott that the imposition of the death penalty in this case would not be a proportionate punishment.
“Due to the uniqueness and finality of death, this Court addresses the propriety of all death sentences in a proportionality review.” Hurst v. State, 819 So.2d 689, 700 (Fla.2002). In determining whether death is a proportionate penalty in a given case, we have explained our standard of review as follows:
“[W]e make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.” We consider the totality of the circumstances of the case and compare the case to other capital cases. This entails “a qualitative review by this Court of the underlying basis for each aggravator *935 and mitigator rather than a quantitative analysis.” In other words, proportionality review “is not a comparison between the number of aggravating and mitigating circumstances.”
Williams v. State, 37 So.3d 187, 205 (Fla.2010) (quoting Offord v. State, 959 So.2d 187, 191 (Fla.2007)). Thus, our proportionality review requires that we discretely analyze the nature and weight of the underlying facts; we do not engage in a “ ‘mere tabulation’ of the aggravating and mitigating factors.” Terry v. State, 668 So.2d 954, 965 (Fla.1996) (quoting Francis v. Dugger, 908 F.2d 696, 705 (11th Cir.1990)).
Here, the jury recommended death by a nine-to-three vote. The trial court found two aggravators, assigning to them both great weight: (1) prior violent felony; and (2) commission during an attempted armed robbery. Both aggravators resulted from Scott’s convictions in this case and were weighed against nine nonstatutory miti-gators: (1) Scott evidenced religious faith (slight weight); (2) Scott has love for his family and friends (slight weight); (3) Scott’s father was absent from his life (slight weight); (4) Scott’s family loves him (slight weight); (5) Scott was a good and respectful son to his family (little weight); (6) Scott is a good surrogate father (slight weight); (7) Scott can be a good father figure from prison (slight weight); (8) Scott overheard domestic abuse as a small child (slight weight); and (9) Scott once stopped a man from stealing from a grocery store (slight weight).
The record certainly demonstrates that this is not a case with substantial mitigation. Nevertheless, we conclude that because the aggravation is dissimilar to other robbery-murder cases where the imposition of the death penalty was upheld, this case is unlike those where the most aggravating circumstances exist.[9]
We first focus on the prior violent felony aggravator, which is present in every case the State cites in support of its argument that Scott’s death sentence is proportionate. Here, the prior violent felony aggra-vator was predicated upon Scott’s contemporaneous conviction for the aggravated battery inflicted upon Gentian Koci. Regarding this aggravated battery, the record reflects that just before shooting Bin-jaku, Scott hit Koci on the head with the butt of his gun. Koci, a friend of the victim’s, was visiting the coin laundry at the time. The record does not reflect whether Koci was ever treated for any type of injury as a result of this strike. In fact, the original indictment charging Scott with first-degree murder did not include the aggravated battery charge.
The State first learned of the battery when Koci was deposed prior to trial. Then, approximately four days before jury selection, the State charged Scott by information with aggravated battery with a deadly weapon for this offense; the trial court consolidated the two cases because both arose from the same series of acts. We set forth these factual circumstances not to minimize the aggravated battery charge, but to place this “prior violent felony” aggravator in context of the proportionality of the death sentence and to evaluate the circumstances qualitatively.
In support of its proportionality argument, the State compares this case to Phillips v. State, 39 So.3d 296 (Fla.), cert. denied, — U.S. -, 131 S.Ct. 520, 178 L.Ed.2d 384 (2010), Hayward v. State, 24 So.3d 17 (Fla.2009), cert. denied, — U.S. -, 130 S.Ct. 2385, 176 L.Ed.2d 777 (2010), Bryant v. State, 785 So.2d 422 *936 (Fla.2001), and Jackson v. State, 502 So.2d 409 (Fla.1986). However, the Phillips and Bryant cases were more aggravated and involved prior violent felony aggravators established by qualitatively different offenses, which were committed at times separate from the murder. See Phillips, 39 So.3d at 301 & n. 7 (finding aggravators that crime was committed during robbery and prior violent felony established by two violent felonies occurring at times separate from murder (shot aunt in legs with sawed-off shotgun and armed robbery wherein defendant discharged gun thirteen times at someone attempting to thwart crime) along with additional aggravator that the murder was committed for purpose of avoiding lawful arrest or effecting escape from custody); Bryant, 785 So.2d at 436-37 & n. 12 (finding same three aggravators as in Phillips and prior violent felony aggra-vator established by previous convictions for “sexual battery, grand theft, robbery with a weapon, and aggravated assault with a mask”). Likewise, in both Hayward and Jackson, the Court considered similar aggravators to those found by the trial court in this case, but the prior violent felony aggravators were qualitatively more compelling. See Hayward, 24 So.3d at 27, 46-47 (prior violent felony aggravator established by three prior violent felonies for second-degree murder and two counts of armed robbery, to which trial court assigned “extremely great weight”); Jackson, 502 So.2d at 410-11 (prior violent felony aggravator established by conviction for previous attempted armed robbery ). Therefore, the State’s reliance on the aforementioned cases is misplaced.
The circumstances giving rise to the pri- or violent felony aggravator — in this case, a contemporaneous aggravated assault— although properly found, militate against the weight that a prior violent felony would normally carry. Cf. Ocha v. State, 826 So.2d 956, 966 (Fla.2002) (finding prior violent felony aggravator “[p]articularly weighty” where defendant’s prior convictions included robbery and one count of attempted murder); Hess v. State, 794 So.2d 1249, 1266 (Fla.2001) (“[T]he [prior violent felony] aggravator in this case, albeit established, is not as ‘weighty’ as it normally would be in cases where the defendant has a significant history of prior violent crimes, which includes prior murders.”); Johnson v. State, 720 So.2d 232, 238 (Fla.1998) (discounting one of Johnson’s prior violent felonies because it was an aggravated assault against his codefen-dant and brother who testified that he was not injured).
While Scott’s aggravated battery conviction unquestionably qualifies as a prior violent felony and a separate aggravator, see Francis v. State, 808 So.2d 110, 136 (Fla.2001), we must consider that the facts supporting this aggravator demonstrate that the battery occurred at the same time as the murder and apparently involved a limited threat of violence and no permanent injury. In fact, the circumstances of this case stand in stark contrast to other robbery-murder cases in which this Court has upheld the sentence of death as proportionate where the prior violent felony aggravator was predicated upon crimes that did not occur contemporaneously with the murder. See, e.g., Lebron v. State, 982 So.2d 649, 667 (Fla.2008) (prior violent felony aggravator established by violent felonies committed shortly before and after the murder); Mendoza v. State, 700 So.2d 670, 679 (Fla.1997) (prior violent felony aggravator established by armed robbery committed in connection with separate case and drawing a distinction between prior violent felony committed as a separate act as opposed to an act contemporaneous with the murder); Heath v. State, 648 So.2d 660, 663 (Fla.1994) (prior violent felony aggravator established by *937 previous conviction for second-degree murder); Melton v. State, 688 So.2d 927, 929 & n. 2 (Fla.1994) (prior violent felony aggra-vator established by unrelated armed robbery and first-degree murder); Freeman v. State, 563 So.2d 73, 75 (Fla.1990) (prior violent felony aggravator established by crimes of first-degree murder, armed robbery, and burglary of a dwelling with an assault, which were committed three weeks before murder).
Furthermore, the prior violent felony aggravator, which was established by the aggravated battery committed during the course of the attempted robbery, is qualitatively different than in cases where this Court has affirmed the death penalty when similar aggravators were considered and the prior violent felony aggravator was based on a contemporaneous criminal act. See, e.g., Frances v. State, 970 So.2d 806, 820-21 (Fla.2007) (finding death sentence proportionate as to victim Mills where aggravation was based on prior violent felony from a contemporaneous conviction for murder of another victim and that the murder was committed during the course of a robbery); Kormondy v. State, 845 So.2d 41, 48 (Fla.2003) (finding death sentence proportionate where two aggravating factors were present ((1) prior violent felony; and (2) the crime was committed while Kormondy was engaged or an accomplice in the commission of an attempt burglary), but prior violent felony aggravator was established by robbery of two victims and a sexual battery of one of the victims during the attempted burglary).
If this Court were to consider the proportionality of the death penalty absent the prior violent felony aggravator found in this case, we would be left to evaluate only one aggravator (commission during attempted armed robbery) in relation to the mitigating factors presented, and the death penalty would unquestionably be disproportionate.[10] In light of these observations, when the facts and circumstances in this case are compared to other capital cases involving a robbery-murder, we conclude that death is not the appropriate penalty.
Although not precisely like the “robbery gone bad” cases where we have reduced the sentence of death to life, see, e.g., Jones v. State, 963 So.2d 180, 188-89 (Fla.2007); Terry, 668 So.2d at 965-66, there is no evidence in this case that Scott planned to shoot any of the individuals inside the coin laundry prior to doing so, and therefore this murder could be viewed as a reactive action in response to the victim’s resistance to the robbery. The fact that Scott left the coin laundry without attempting to shoot any of the remaining eyewitnesses further supports the inference that the defendant lacked a prearranged plan to murder.
We note that the facts of this case are most similar to those presented in Johnson, 720 So.2d at 235, 238, where defen *938 dant Johnson was convicted of first-degree murder and other robbery-related offenses for the shooting death of Willie Gaines. As in the instant case, during Johnson’s trial, one witness testified that Johnson claimed to have shot the victim after the victim resisted the robbery. Id. at 235. This Court upheld the defendant’s conviction for first-degree murder under both premeditated and felony-murder theories, explaining that Johnson shot the victim multiple times during the course of the burglary and then finally, without provocation, shot the victim in the jaw. Id. at 236. However, we vacated Johnson’s sentence of death. Id. at 239.
In Johnson, the trial court found two aggravators (prior violent felony and burglary/pecuniary gain) and several miti-gators, including the statutory mitigator that Johnson was twenty-two at the time of the crime, and several nonstatutory mit-igators, including that (1) Johnson voluntarily surrendered to the police; (2) Johnson had a troubled childhood; (3) Johnson was previously employed; (4) Johnson was a good son and good neighbor; (5) Johnson had a young child; and (6) Johnson earned his GED and participated in high school athletics. Id. at 235. In reducing Johnston’s penalty to a life sentence, we approved the trial court’s finding that the murder was aggravated by the defendant’s prior convictions of four violent felonies— aggravated assault, aggravated battery, robbery with a firearm, and attempted murder — and the fact that murder was committed during the course of a burglary. Id. at 237-38. Notwithstanding that fact, we found that the prior violent felony ag-gravator was not compelling when the circumstances surrounding the prior offenses were considered, reasoning as follows:
The prior violent felony aggravating circumstance, although properly found to be present, is not strong when the facts are considered. The aggravator is based in part on an aggravated assault committed by [the defendant] upon his brother, Anthony. Anthony testified in the present case that he was not injured in the confrontation with his brother and that the entire incident occurred because of a misunderstanding. The ag-gravator is also based in part on [the defendant’s] two contemporaneous convictions as principal to crimes against [the victim] simultaneously committed by codefendant Anthony.
Id. at 238. After considering these circumstances with the mitigating evidence presented and similar other capital cases, we concluded that the crime committed by Johnson was “not among those for which the death penalty is specifically reserved.” Id.
Like the defendant in Johnson, Scott was convicted under both premeditated and felony-murder theories and his penalty-phase proceeding produced comparable mitigation. As in Johnson, the evidence here certainly supports a finding of two aggravating circumstances; however, those aggravators are simply not compelling when the circumstances surrounding Scott’s contemporaneous felony are adequately considered: the prior violent felony was predicated upon an aggravated battery occurring at the' same time as the murder, it involved a relatively limited use of violence, and was not charged until the eve of trial. Moreover, the facts of the murder are less compelling than in Johnson, where the record reflected that Johnson shot the victim multiple times and then, without provocation, again shot the victim in the jaw. Id. at 236. Here, Scott shot Binjaku only once, and, by Scott’s account, the shot was in response to Binja-ku rushing at him with a chair.
Based upon our review of the record and similar capital cases, we are compelled to conclude that this case does not fall into the narrow category of “the most egre *939 gious of murders” in order to warrant the imposition of death. Jones, 963 So.2d at 189.
CONCLUSION
In accordance with our analysis above, we affirm Scott’s conviction for first-degree murder but vacate the sentence of death and remand for the imposition of a sentence of life imprisonment without the possibility of parole.
It is so ordered.
PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
POLSTON, J., concurs in part and dissents in part with an opinion, in which CANADY, C.J., concurs.

. “Miami” was the nickname of Scott's accomplice during the robbery. Law enforcement never located Miami.

. Bolling pled guilty to second-degree murder and attempted robbery in exchange for testifying in Scott’s case. For each offense, Bolling was sentenced to time served — 678 days — to run concurrently and ten years' probation.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The trial court rejected the following statutory mitigating factors: (1) the defendant has no significant history of prior criminal activity: and (2) the age of the defendant at the time of the crime.

. Scott makes the following five claims: (1) the trial court erred in denying his motion for mistrial based on the prosecutor’s guilt-phase closing argument commentary; (2) the trial court erred in denying his motion for mistrial based on a defense witness’s cross-examination testimony that Scott had been incarcerated for an uncharged crime; (3) the trial court erred in denying his motion to suppress the recording of Scott’s jailhouse statements; (4) his death sentence is not proportionate; and (5) the death sentence imposed and Florida's capital sentencing scheme are unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
Because we determine that the death sentence is not proportionate, we do not reach the Ring claim. Moreover, because Scott does not challenge his attempted robbery and aggravated battery convictions, we do not address either conviction in this appeal.

. To the extent that this argument can be construed as a Fifth Amendment challenge based on a custodial interrogation without the required Miranda warnings, as opposed to merely a conversation between Scott and Bolling, we find that this argument has not been sufficiently pled and is therefore waived. See Coolen v. State, 696 So.2d 738, 742 n. 2 (Fla.1997) (stating that a failure to fully brief and argue points on appeal "constitutes a waiver of these claims”); see also Victorino v. State, 23 So.3d 87, 103 (Fla.2009) (“We have previously stated that '[t]he purpose of an appellate brief is to present arguments in support of the points on appeal.’ ” (quoting Duest v. Dugger, 555 So.2d 849, 852 (Fla.1990))).

. To any extent that Scott relies on Escobedo to support his constitutional claim, we conclude the Supreme Court decision does not apply in this case. The Supreme Court limited the holding of Escobedo to its own facts, and because those facts are not analogous to the facts in this case, Escobedo is inapplicable. See Kirby, 406 U.S. at 689, 92 S.Ct. 1877 ("[T]he Court has limited the holding of Esco-bedo to its own facts and those facts are not remotely akin to the facts of the case before us.”).

. We note that the United States Supreme Court's decision in United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), is distinguishable from the case at bar. In Henry, the Supreme Court held that the Sixth Amendment right to counsel prohibited the post-indictment admission of incriminating statements the defendant made to his cellmate, an undisclosed and paid government informant, while the defendant was in custody on the indicted offense. See id. at 269-71, 274, 100 S.Ct. 2183. In this case, although Scott was in custody on an unrelated drug arrest, he had not been formally charged for the crime at issue — first-degree murder — nor had an indictment been issued. Because no formal proceedings against Scott had begun on the crime of first-degree murder, the holding in Henry does not apply to the facts we confront here.

. At oral argument before this Court, the State did not contest that this case lacks strong aggravation and actually referred to the murder as "poorly aggravated.”

. This Court has previously vacated the death sentence where the sole aggravating factor was that the murder was committed during the course of a robbery. See, e.g., Sinclair v. State, 657 So.2d 1138, 1139-40 & n. 1, 1142 (Fla.1995) (reversing death sentence for shooting death of cab driver where pecuniary gain and commission during a robbery were sole merged aggravator, which was weighed against three nonstatutory mitigators given little to no weight and this Court’s finding of Sinclair’s low intelligence and emotional disturbances); Thompson v. State, 647 So.2d 824, 825-28 (Fla.1994) (reversing death sentence for shooting death of fast-food worker where commission during robbery was the sole aggravating circumstance, which was weighed against several nonstatutory mitigating circumstances); Lloyd v. State, 524 So.2d 396, 397, 403 (Fla.1988) (reversing death sentence for shooting death of woman at home where commission during a robbery was sole aggravator, which was weighed against one mitigating circumstance — -that Lloyd had no significant history of prior criminal activity).