PER CURIAM.
Michael M. Yacob, who was twenty-two years old at the time of the crime, was convicted of first-degree murder and armed robbery with a firearm in the May 2008 death of nineteen-year-old Moussa Maida. The trial court, in accordance with the jury’s recommendation, sentenced Ya-cob to death for the murder. This is Yacob’s direct appeal from his judgment of conviction and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.
We affirm the convictions for first-degree murder and armed robbery with a firearm, but we vacate the sentence of death because we conclude that a death sentence in this case is not proportionate to other cases in which the sentence of death has been upheld. In fact, we conclude after careful review that this case is indistinguishable from other cases involving the single aggravator of a murder during the commission of a robbery where we have vacated the death penalty. Accordingly, we vacate Yacob’s death sentence and remand for imposition of a sentence of life imprisonment without the possibility of parole.
I. BACKGROUND
In March 2010, a grand jury indicted Yacob for first-degree murder and armed robbery with a firearm for the May 2008 robbery of a Jacksonville convenience store and murder of the store’s clerk. The jury trial was held in October 2011.
A. Guilt Phase
The evidence presented at trial included both eyewitness testimony and audio-video recordings from security cameras of the events that occurred on Sunday morning, May 4, 2008. Before 8 a.m., a car cruised past the closed Snappy Food store, returned, and parked across the street from the store. Soon thereafter, nineteen-year- *541 old Moussa Maida arrived at the family-owned store, unlocked the front door, and, once inside, lit the “open” sign in the store’s window. Maida walked to the end of the glass-encased cashier’s booth, entered, and began filling the cash registers.
Not long after Maida entered the store, Yacob exited the car parked across the street. Yacob wore dark pants and a loose-fitting camouflage jacket, the hood of which covered his head. A mask covered his face, and he wore an orange, plastic glove on his left hand. Yacob quickly crossed the street and entered the store. He then walked down an aisle away from the cashier’s booth.
Having heard the buzzer sound when Yacob entered, Maida soon exited the cashier’s booth. Walking along in front of the booth toward the front door, he looked down each aisle for the customer. He soon encountered Yacob, who pointed a loaded nine millimeter semi-automatic gun at him and said, “Money.” Maida put his hands in the air and led Yacob into the cashier’s booth. Pointing the gun at Mai-da with both hands, Yacob ordered Maida to fill a plastic bag with money, and Maida complied, emptying the cash and change from each register into the bag. Yacob then said, “safe, safe,” and Maida responded that there was no safe but gave Yacob cash stored beneath the counter.
Yacob reached down and grabbed a cell phone that belonged to the store and then, in reference to the security camera, asked if there was a videotape or CD. Maida told Yacob that there was no videotape or CD and then stood up, hands in the air, and gave Yacob the remote control. Still compliant and his hands up, Maida again knelt down.
Holding the plastic bag of money, Yacob exited the cashier’s booth, and Maida stood up. Rounding the corner of the booth as he headed for the front door, Yacob pocketed the gun but kept an eye on Maida. Just as he passed the midpoint of the booth, Yacob saw Maida move to the counter and reach underneath it. Maida flipped a switch that magnetically locked the store’s front door and then moved quickly toward the door of the cashier’s booth.
Upon seeing Maida’s maneuver, Yacob pulled the gun out of his pocket and pointed it toward Maida as he ran back to the door of the cashier’s booth. Maida, however, reached the booth’s door first and was locking it when Yacob arrived. Yacob immediately fired a shot that hit the door frame. Yacob then dropped the plastic bag full of money, and holding the gun with both hands, pointed it at Maida and fired. The bullet traveled through the thick glass door, striking Maida in the chest.
Yacob ran to the store’s front door but was unable to escape because burglar bars and the locked glass door prevented him from doing so. Yacob spent the next several minutes trying to figure out how to escape. He first hit the door with his gun and shot at it, breaking the exterior glass. Then, he ran to the cashier’s booth and shouted for Maida to open the door. Ya-cob returned to the door and put the plastic bag of money on a nearby table. However, the unstable bag fell, emptying its contents on the floor, and Yacob began gathering the money and placing it in his pockets. After putting the gun down, he finally succeeded in pulling some of the burglar bars in the door sufficiently apart so that he could squeeze between them and exit the store. Before escaping, he reached back into the store and retrieved his gun, although he left behind the plastic bag that initially contained the stolen money. He then ran to the waiting car, jumped into the passenger side, and fled the scene.
*542 Anthony Hardy, a regular customer who had entered the store unnoticed, quickly hid when he heard the voices and gunshots. After observing Yacob’s escape efforts, Hardy went to the front of the store, exited through the opening Yacob had created, and ran into the parking lot calling for someone to phone 911. Then, he went back into the store and tried unsuccessfully to break into the cashier’s booth to help Maida, who was already dead.
The medical examiner testified that the bullet entered Maida’s chest and traveled through his heart and right lung and into his back. As a result, Maida suffered rapid blood loss that quickly resulted in unconsciousness and death in little more than a minute.
Blood was found on the floor near the store’s front door, the interior and exterior handles of the door, a plastic bag, and a five-dollar bill. The DNA from these blood samples matched the DNA from a cheek swab subsequently obtained from Yacob. The probability of the DNA from the murder scene matching anyone other than Yacob, who is African-American, was one in fifty-nine quadrillion among African-Americans. In addition, latent prints lifted from the plastic bag that the masked robber handled also matched Yacob’s palm and finger prints. Moreover, Yacob’s height and weight were consistent with that of the masked robber in the store’s security video and Hardy’s eyewitness description.
At the close of the State’s case, the defense’s motion for judgment of acquittal was denied. Defense counsel announced that no defense witnesses would be called, and after Yacob waived his right to testify, the defense rested. The next day, the trial court denied the defense’s renewed motion for judgment of acquittal. The jury found Yacob guilty as charged of first-degree murder and armed robbery with a firearm. The murder conviction was premised on the alternative grounds of both premeditated murder and felony murder based on the commission of an armed robbery with a firearm.
B. Penalty Phase
Discussions regarding a penalty phase in the event of a guilty verdict began shortly before the guilt phase of trial ended. Defense counsel indicated that previously he had videotaped interviews with several potential witnesses who lived in Seattle. Before moving to Jacksonville to live with his father and his family, Yacob had lived with his mother and attended high school in Seattle. Counsel stated that it was his intent to present “snippets” from those unsworn interviews during the penalty phase. Upon the prosecutor’s request, the trial court instructed counsel to provide the prosecutor with copies of the videotaped interviews immediately.
The jury returned the guilty verdicts on October 6, 2011. At a hearing a week later, the defense presented a list of eight mitigation witnesses — five from Seattle (Yacob’s mother, grandmother, and three teachers) and three from Jacksonville (Ya-cob’s father, stepmother, and the defense investigator). Counsel reiterated that the videotapes of the interviews of the five Seattle witnesses would be presented. Noting that the defense had not yet provided copies of the videotaped interviews, the prosecutor objected on the basis that he could not cross-examine the Seattle witnesses and they were not under oath. The trial court ruled that the videotaped interviews were inadmissible hearsay.
Defense counsel then informed the trial court that Yacob wished to waive calling any mitigation witnesses, except the defense investigator David Douglas. Although Yacob did not waive presentation of all mitigation, the trial court immediately conducted a hearing pursuant to Koon v. *543 Dugger, 619 So.2d 246, 250 (Fla.1993), which “require[s] the defendant to confirm on the record that ... despite counsel’s recommendation, he wishes to waive presentation of penalty phase evidence.” Under oath and after the trial court’s inquiry, Yacob affirmed that because he did not wish to cause his family further pain, he wanted only the defense investigator to testify. In light of this development, the trial court ordered that Douglas be deposed under oath.
Before the commencement of penalty-phase proceedings, the trial court reviewed a recording of the defense investigator’s deposition. After hearing argument, the trial court ruled that Douglas could testify only to those matters within his personal knowledge and could not testify to matters that were based solely on what one of Yacob’s family members or teachers told him. The trial court also questioned Ya-cob regarding his decision not to call other witnesses, some of whom were present in the courtroom. The trial court outlined the nonstatutory mitigation proposed by the defense and stated that, if called, Ya-cob’s former teachers and family members could testify to this mitigation. The trial court also offered to permit the Seattle witnesses to testify by telephone. Yacob acknowledged his understanding of the available mitigation and affirmed that he was acting against the advice of counsel by waiving the presentation of this evidence. He also waived his own right to testify during the penalty phase.
With the jury present, the penalty phase commenced with members of the victim’s family reading victim impact statements and identifying various family photos. Then, Douglas, the defense investigator, testified regarding Yacob’s biography. Yacob was born in the African country of Eritrea in 1985 and moved to Addis Aba-ba, Ethiopia, at age’ two. In 1998, he immigrated to the United States and lived with his father in East Orange, New Jersey, for several years. In 2001, he moved to Seattle, Washington, where his mother and grandmother lived and where he graduated from high school two years later. After graduation, he moved to Jacksonville, Florida, where he resided with his father, stepmother, and siblings.
Douglas then identified pictures of Ya-cob’s family and friends and of Yacob’s mother’s Seattle home, which contained various Christian religious icons. Based on his conversations with Yacob and his family members, Douglas testified that Ya-cob loves his family and they love him.
The jury recommended a sentence of death by a vote of ten to two.
C. Spencer Hearing
At the Spencer[1] hearing, the defense again offered the videotaped interviews of the Seattle witnesses into evidence. The prosecutor acknowledged having received copies of the videotaped interviews the day before the hearing and did not object to their admission into evidence. The trial court accepted the recordings into evidence and also admitted the defense investigator’s deposition.
As he had done during the penalty phase, Yacob waived his right to testify and to present mitigation witnesses during the Spencer hearing. He did not, however, object to admission of the presentence investigation report (PSI) prepared by the Florida Department of Corrections. See Fla. R.Crim. P. 3.710. The PSI indicated that Yacob had performed well in school despite numerous suspensions for behavioral problems. He had worked as a clerk in various convenience stores in Jacksonville and had several misdemeanor brushes *544 with the law, as to which adjudication was withheld or the charges dropped. In addition, his record showed that he was sentenced to a prison term on a felony conviction of fleeing to elude. The PSI also contained a brief family history provided by Yacob and verified in part by his father.
The prosecutor offered, and the trial court accepted into evidence, a 2001 Washington state judgment adjudicating Yacob delinquent on two counts of third-degree assault regarding a schoolyard fight. However, the trial court denied the admission of the corresponding probable cause statement upon the defense’s hearsay objection. When given the opportunity, the prosecutor expanded on his prior objection to the videotaped interviews of the Seattle witnesses and described the areas in which he would have cross-examined them, particularly the teachers. Subsequently, the trial court accepted the prosecutor’s statement that Yacob was placed in an alternative high school because of the schoolyard fight, based on facts Yacob had admitted in a 2010 interview with Jacksonville police.
D. Sentencing
At the sentencing hearing, the trial court sentenced Yacob to life without the possibility of parole for the armed robbery and sentenced him to death for the first-degree murder of Moussa Maida. In support of the death sentence, the trial court found two aggravators: the capital felony was committed (1) during the commission of a robbery and (2) for pecuniary gain. The trial court, however, also found that the two aggravators merged to become a single aggravator.
With regard to mitigation, the trial court noted that Yacob validly waived the presentation of most mitigation. In addition, the trial court found that although the videotaped interviews of the Seattle witnesses and the defense investigator’s deposition were admitted into evidence at the Spencer hearing without objection, the trial court did not consider or weigh those hearsay statements in determining the sentence. The trial court then made findings regarding the mitigation that could be analyzed and weighed.
The trial court found that the statutory mitigator of age — Yacob was twenty-two— was established but ascribed it no weight. See § 921.141(6)(g), Fla. Stat. (2008). The trial court also found that the following nonstatutory mitigation was established and gave it the weight indicated: Yacob initially left without hurting anyone (no weight); Yacob did not harm anyone else in the store (little weight); Yacob emigrated from a foreign country (little weight); Yacob was intelligent and graduated from high school (slight weight); Yacob loves his family, and his family loves him (slight weight); and Yacob exhibited appropriate behavior at trial (no weight). Finally, the trial court found the following nonstatuto-ry mitigation was either not established or was not proper mitigation and thus afforded it no weight: Yacob was in a panic during the shooting; everyone believed that the glass was “bulletproof,” and Yacob did not know he killed anyone; Yacob was a diligent student who overcame academic challenges; Yacob is a hard worker; Ya-cob was raised in a religious home and has faith in God; Yacob was abandoned by his father, torn between parents, and abused by his father; Yacob had no friends while growing up; Yacob once came to the defense of a boy being bullied; and society would be protected even if Yacob was sentenced to life imprisonment.
II. ANALYSIS
In this appeal from his conviction for first-degree murder and sentence of death, Yacob raises three claims, all of which relate to the death sentence imposed: (1) *545 Florida’s capital sentencing proceedings are unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); (2) the trial court erred by failing to consider certain mitigation evidence admitted during the Spencer hearing; and (3) the death sentence in this case is disproportionate when compared to similar single-aggravator cases. Because we grant relief as to Yacob’s third claim and determine that the death sentence is not proportionate, we do not reach Yacob’s first or second claims, which relate only to the validity of the sentence of death.
We begin, however, with our mandatory obligation to independently determine whether there is sufficient evidence to support Yacob’s conviction for first-degree murder.
A. Sufficiency of the Evidence
Although Yacob has not challenged the sufficiency of the evidence underlying the guilty verdicts, this Court has a mandatory obligation to review the sufficiency of the evidence in every case in which a sentence of death has been imposed, even when not challenged. See Jones v. State, 963 So.2d 180, 184 (Fla.2007); Fla. R.App. P. 9.142(a)(5) (“On direct appeal in death penalty eases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief.”). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Bradley v. State, 787 So.2d 732, 738 (Fla.2001).
In this case, Yacob was charged with first-degree murder under both the premeditated murder and felony murder theories. See § 782.04, Fla. Stat. (2008). The jury found Yacob guilty by special verdict under both theories. The felony murder conviction was based on the jury finding Yacob guilty of armed robbery with a firearm. See id.
As outlined in the facts recounted in this opinion, the DNA evidence from the blood found at the crime scene, as well as the fingerprint and palmprint evidence, established that Yacob was the masked person in a camouflage jacket appearing in the store’s security recordings from May 4, 2008. The recordings, as well as eyewitness testimony, established that Yacob held a gun on Maida, demanded money, and directed him into the cashier’s booth. Maida complied with all of Yacob’s directives, and Yacob left the booth with the money in a plastic bag.
However, upon observing Maida move to the counter to flip the magnetic door switch, and then quickly run to lock the cashier’s booth door, Yacob pulled his gun out of his pocket and pointed it toward Maida. As Maida locked the booth’s door, Yacob fired a shot at close range. Then, after placing the bag of money on the floor, Yacob held the gun with both hands, aimed it at Maida, and fired again. That shot pierced the glass and entered Maida’s chest, penetrating both his heart and right lung. Maida died soon thereafter. Yacob immediately ran to the locked door and broke the glass, eventually bent the burglar bars, and escaped with money from the plastic bag stuffed in his pockets.
Accordingly, we conclude that the record in this case contains sufficient evidence to support the verdicts of guilt on the counts of (1) first-degree murder, under both the felony and premeditated theories, and (2) armed robbery with a firearm. We therefore affirm Yacob’s convictions.
We now address Yacob’s claim that the death sentence imposed by the trial court for the murder is not proportionate.
*546 B. Proportionality of the Sentence
Yacob contends that his death sentence is disproportionate to other cases in which the sentence of death has been imposed, pointing to this Court’s well-established precedent that death is generally not a proportionate penalty in a single aggravator “robbery gone bad” case. The State counters that Yaeob’s death sentence, which is based on only the single aggravator of a murder committed during the course of a robbery, is proportionate in light of its “distinctive” facts and “weak” mitigation that, considering the totality of the circumstances, allegedly differentiates this case from other single aggravator cases in which this Court has held the death penalty to be disproportionate.
For the reasons we explain, we conclude that Yacob’s sentence is not proportionate and therefore vacate his sentence of death. We also reject the view of the dissenting-in-part opinion — not raised by any party in this proceeding or previously by any party in the hundreds of death penalty proceedings to come before this Court — that this Court is precluded by the conformity clause of article I, section 17, of the Florida Constitution from engaging in proportionality review of death sentences and that we should recede from our long-standing precedent requiring such review.
Contrary to the view espoused by the dissenting-in-part opinion that the state constitutional conformity clause precludes us from engaging in proportionality review because this review is not required by the Eighth Amendment, we conclude that our proportionality review flows from Florida’s capital punishment statute — section 921.141, Florida Statutes. This statute provides that every judgment of conviction and sentence of death “shall be subject to automatic review” by this Court. § 921.141(4), Fla. Stat. (2008). Section 921.141 further provides that this review “shall be heard in accordance with rules promulgated” by this Court. Id.
Forty years ago, in State v. Dixon, 288 So.2d 1,10 (Fla.1973), this Court interpreted section 921.141 as including proportionality review of death sentences, concluding that this Court’s automatic, mandatory, and statutorily required review of death penalty cases “must begin with the premise that death is different.” Fitzpatrick v. State, 527 So.2d 809, 811 (Fla.1988) (citing Dixon, 283 So.2d at 7). In upholding the constitutionality of Florida’s amended capital punishment statute in the aftermath of the United States Supreme Court’s decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), this Court explained that proportionality review “guarantees that the reasons present in one case [for imposition of the death penalty] will reach a similar result to that reached under similar circumstances in another case.” Dixon, 283 So.2d at 10.
As we stated then and have consistently reaffirmed during the past four decades, “[i]f a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great” in order to control and channel the sentencing process until it “becomes a matter of reasoned judgment,” Dixon, 283 So.2d at 10, rather than an exercise in the kind of “uncontrolled discretion” that led the Supreme Court in Furman, 408 U.S. at 253, 92 S.Ct. 2726 (Douglas, J., concurring), to invalidate the death penalty as applied “under sentencing procedures that created a substantial risk that [death] would be inflicted in an arbitrary and capricious manner.” Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion). In other words, “[b]ecause death is a unique punishment, it is necessary in each case to engage in a thoughtful, deliberate proportionality review to consider *547 the totality of circumstances in a case, and to compare it with other capital cases.” Porter v. State, 564 So.2d 1060, 1064 (Fla.1990) (citation omitted).
This Court has stated that proportionality review “arises in part by necessary implication from the mandatory, exclusive jurisdiction this Court has over death appeals.” Tillman v. State, 591 So.2d 167, 169 (Fla.1991) (citing art. V, § 3(b)(1), Fla. Const.). As we have previously articulated:
The obvious purpose of this special grant of jurisdiction is to ensure the uniformity of death-penalty law by preventing the disagreement over controlling points of law that may arise when the district courts of appeal are the only appellate courts with mandatory appellate jurisdiction. Thus, proportionality review is a unique and highly serious function of this Court, the purpose of which is to foster uniformity in death-penalty law.
Id. (citation omitted).
This Court has also explained that in enacting section 921.141, “the legislature intended the death penalty to be imposed ‘for the most aggravated, the most indefensible of crimes.’ ” Fitzpatrick, 527 So.2d at 811 (quoting Dixon, 288 So.2d at 8). As stated in Dixon, “[djeath is a unique punishment in its finality and in its total rejection of the possibility of rehabilitation. It is proper, therefore, that the Legislature has chosen to reserve its application to only the most aggravated and unmitigated of most serious crimes.” 283 So.2d at 7. “A high degree of certainty in procedural fairness as well as substantive proportionality must be maintained in order to insure that the death penalty is administered evenhandedly.” Fitzpatrick, 527 So.2d at 811.
Several of the reasons that led this Court to uphold Florida’s amended capital punishment statute in Dixon were critical to the United States Supreme Court’s subsequent decision to uphold the constitutionality of capital punishment in the aftermath of Furman. In Gregg, 428 U.S. at 189, 96 S.Ct. 2909 a plurality of the Supreme Court explained that Furman “mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.”
Key to what this Court has described as the “reasonable and controlled, rather than capricious and discriminatory” discretion necessary to uphold Florida’s capital sentencing scheme as constitutional is “[r]e-view of a sentence of death by this Court, provided by Fla. Stat. § 921.141.” Dixon, 283 So.2d at 7, 8. Indeed, in Gregg, the Supreme Court plurality declared a similar provision in Georgia’s death penalty statute — providing for automatic appeal of all death sentences and a statutory requirement that each sentence of death be reviewed to determine “whether the sentence is disproportionate compared to those sentences imposed in similar cases” — to be “an important additional safeguard against arbitrariness and caprice” in the imposition of the death penalty. Gregg, 428 U.S. at 198, 96 S.Ct. 2909. As the Supreme Court stated:
In short, Georgia’s new sentencing procedures require as a prerequisite to the imposition of the death penalty, specific jury findings as to the circumstances of the crime or the character of the defendant. Moreover, to guard further against a situation comparable to that presented in Furman, the Supreme Court of Georgia compares each death sentence with the sentences imposed on similarly situated defendants to ensure *548 that the sentence of death in a particular case is not disproportionate. On their face these procedures seem to satisfy the concerns of Furman. No longer should there be “no meaningful basis for distinguishing the few cases in which (the death penalty) is imposed from the many cases in which it is not.” 408 U.S., at 313 [92 S.Ct. 2726] (White, J., concurring).

Id.

Moreover, in Proffitt v. Florida, 428 U.S. 242, 251, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion), a plurality of the Supreme Court, in specifically upholding the constitutionality of Florida’s amended capital punishment statute after Furman, cited to this Court’s discussion in Dixon of proportionality review as part of the “procedures, like those used in Georgia [and discussed in Gregg ], [that] appear to meet the constitutional deficiencies identified in Furman.” The Supreme Court explained that the “Florida capital-sentencing procedures ... seek to assure that the death penalty will not be imposed in an arbitrary or capricious manner” and that “to the extent that any risk to the contrary exists, it is minimized by Florida’s appellate review system.” Id. at 252-53, 96 S.Ct. 2960. The Supreme Court plurality explained this review, an essential linchpin to upholding the facial constitutionality of Florida’s amended death penalty statute, as follows:
Under Florida’s capital-sentencing procedures, in sum, trial judges are given specific and detailed guidance to assist them in deciding whether to impose a death penalty or imprisonment for life. Moreover, their decisions are reviewed to ensure that they are consistent with other sentences imposed in similar circumstances. Thus, in Florida, as in Georgia, it is no longer true that there is “ ‘no meaningful basis for distinguishing the few cases in which (the death penalty) is imposed from the many cases in which it is not.’ ” Gregg v. Georgia, 428 U.S., at 188 [96 S.Ct. 2909], quoting Furman v. Georgia, 408 U.S., at 313 [92 S.Ct. 2726] (White, J., concurring). On its face the Florida system thus satisfies the constitutional deficiencies identified in Furman.
Id. at 253, 96 S.Ct. 2960 (emphasis added).
In addition, the Supreme Court specifically cited Dixon and this Court’s proportionality review as a basis to reject the defendant’s contention that, “while perhaps facially acceptable, [Florida’s] new sentencing procedures in actual effect are merely cosmetic, and that arbitrariness and caprice still pervade the system under which Florida imposes the death penalty.” Id. at 254, 258, 96 S.Ct. 2960. The Supreme Court explained that this Court “has undertaken responsibly to perform its function of death sentence review with a maximum of rationality and consistency,” comparing the circumstances of cases under review with those of previous cases “to ensure that similar results are reached in similar cases,” thereby assuring “that the death penalty will not be imposed on a capriciously selected group of convicted defendants.” Id. at 258-59, 96 S.Ct. 2960.
For decades since Proffitt, Gregg, and Dixon, this Court has consistently explained — unchallenged by the State in any proceeding, including this one — that Florida’s capital sentencing scheme mandates that this Court review the sentence of death in every capital case to determine whether the punishment is proportionate. See, e.g., Anderson v. State, 841 So.2d 390, 407 (Fla.2003) (“Due to the uniqueness of the penalty, this Court addresses the propriety of all death sentences in a proportionality review.”). This requirement is embodied in the rules promulgated by this Court for review of death penalty cases, *549 see § 921.141(4), Fla. Stat., requiring the Court to review the proportionality of the death sentence regardless of whether the issue is raised by the defendant. See Fla. R.App. P. 9.142(a)(5) (“On direct appeal in death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief.”).
Although the dissenting-in-part opinion offers numerous citations as support for its proposition as to the basis for our proportionality review, see dissenting-in-part op. at 560-61, all of those cases either directly cite to or quickly trace back to Tillman, 591 So.2d at 169, in which this Court explained that “[t]he requirement that death be administered proportionately has a variety of sources in Florida law.” Indeed, while “the Florida Constitution’s express prohibition against unusual punishments” was listed as one reason for undertaking proportionality review, this Court also specifically stated in Tillman that “proportionality review in death cases rests at least in part on the recognition that death is a uniquely irrevocable penalty, requiring a more intensive level of judicial scrutiny or process than would lesser penalties.” Id. (citing art. I, § 9, Fla. Const., which is the Florida Due Process Clause, and Porter, 564 So.2d at 1064, which explained that a “thoughtful, deliberate proportionality review” is necessary “[bjecause- death is a unique punishment”).
To adopt the view of the dissenting-in-part opinion that this Court should, sua sponte, recede from decades of precedent mandating proportionality review of death sentences would raise substantial constitutional questions as to the defendant in this case, who, as even the dissenting-in-part opinion concedes, is similarly situated to other defendants whose sentences have been reduced to life on proportionality grounds. See generally Duncan v. Moore, 754 So.2d 708, 712 (Fla.2000) (explaining that equal protection requires that “persons similarly situated be treated similarly”). In fact, as set forth in detail below, this case is completely indistinguishable from other comparable cases in which we have vacated the death sentence because it was disproportionate.[2]
As this Court has repeatedly stated, the death penalty is “reserved only for those cases where the most aggravating and least mitigating circumstances exist.” Silvia v. State, 60 So.3d 959, 973 (Fla.2011) (quoting Terry v. State, 668 So.2d 954, 965 (Fla.1996)). “Therefore, in deciding whether death is a proportionate penalty, the Court makes a ‘comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in *550 the application of the sentence.’ ” Id. (quoting Anderson, 841 So.2d at 407-08).
“This entails ‘a qualitative review ... of the underlying basis for each aggra-vator and mitigator rather than a quantitative analysis.’ ” Offord v. State, 959 So.2d 187, 191 (Fla.2007) (quoting Urbin v. State, 714 So.2d 411, 416 (Fla.1998)). “In reviewing the sentence for proportionality, this Court will accept the jury’s recommendation and the weight assigned by the trial judge to the aggravating and mitigating factors.” Silvia, 60 So.3d at 973.
In this case, the jury found Ya-cob guilty as charged of one count of first-degree murder, as both premeditated murder and felony murder based on the armed robbery conviction. The jury voted ten to two to recommend death. The trial court initially found two aggravators — that the murder was committed in the course of a robbery and that the murder was committed for pecuniary gain. See § 921.141(5)(d), (f), Fla. Stat. (2008). However, the trial court correctly recognized that “the pecuniary gain aggravator must merge with the murder in the course of a felony aggravator when the latter is based on a robbery conviction.” Francis v. State, 808 So.2d 110, 136 (Fla.2001). Accordingly, there is only a single aggra-vator in this case.
With regard to mitigation, the trial court found that Yacob’s age (twenty-two) supported the finding of the statutory age mitigator, § 921.141(6)(g), Fla. Stat. (2008), but assigned it no weight in light of the degree of planning evidenced in the execution of the crime, citing Yacob’s disguise and use of a getaway driver. The trial court also found six nonstatutory mitigating factors and ascribed each little to no weight: Yacob initially left without hurting anyone (no weight), did not harm anyone else in the store (little weight), immigrated to the United States (little weight), is intelligent and graduated from high school (slight weight), loves and is loved by his family (slight weight), and exhibited appropriate behavior at trial (no weight).
After a thorough review of the record, we disagree with the trial court’s determination that the crime in this case was not a “robbery gone bad.” The evidence shows that although Yacob held a gun on Maida while in the cashier’s booth, he pocketed it as he left the booth and continued walking toward the front door despite seeing Mai-da stand up inside the cashier’s booth. Perceiving Maida’s sudden movement first to the counter and then toward the booth door as a threat to the completion of the robbery and his escape, however, Yacob immediately pulled out the gun, ran back to the booth door, and shot twice, killing Maida with the second shot. There was no indication that murdering Maida was part of Yacob’s original robbery plan.
This Court has “stated that generally a death sentence is not proportionate when supported by a single aggravator and the mitigation is substantial.” Rodgers v. State, 948 So.2d 655, 670 (Fla.2006). “On the other hand, when the mitigation is not substantial, we have found death sentences to be proportional even when there is but a single aggravator.” Id. Although the mitigation in this case is not substantial, we nevertheless hold that the sentence of death is disproportionate because we conclude that this case is comparable to others in which we vacated the death sentence because it was disproportionate.
First, in Johnson v. State, 720 So.2d 232, 236 (Fla.1998), the defendant was convicted of first-degree murder based on evidence that this Court described as “sufficient to uphold the conviction based on a theory of premeditation or felony murder” during the course of a burglary. The trial court sentenced the defendant to death *551 after finding two aggravators — a prior violent felony conviction, and the merged ag-gravator of committed in the course of a burglary and pecuniary gain — and ascribing substantial to slight weight to the age statutory mitigator and six nonstatutory mitigators, including troubled childhood, good son and neighbor, and earned high school equivalency certificate. Id. at 235. Although we found proportionality to be a “close question,” we determined that the prior violent felony aggravator was not strong, and the totality of the circumstances, both standing alone and in comparison to similar cases, supported vacating the death sentence. Id. at 238.
We also vacated a death sentence in Scott v. State, 66 So.3d 923, 925 (Fla.2011). In that case, the defendant was convicted of first-degree murder, under both the felony and premeditated murder theories, attempted armed robbery, and aggravated battery. Id. at 928. Scott planned a robbery and upon entering the business hit one man on the head with his gun and shot and killed the owner after he told Scott that he had no money. Id. at 925-26. The trial court found two statutory aggrava-tors: a prior violent felony conviction and committed in the course of an attempted armed robbery. Id. at 928-29. In mitigation, the trial court found nine nonstatuto-ry mitigating factors — including that Scott loved his family, was respectful, evidenced religious faith, and was a good surrogate father — according each slight or little weight. Id. at 935. We determined that under the totality of the circumstances, the aggravators — though properly found— were not particularly weighty, and concluded that comparable cases “were more aggravated and involved prior violent felony aggravators established by qualitatively different offenses, which were committed at times separate from the murder.” Id. at 936. Moreover, the murder in Scott was more a “reactive action in response to the victim’s resistance to the robbery” than a “prearranged plan.” Id. at 937.
Similarly, in Thompson v. State, 647 So.2d 824, 827 (Fla.1994), we vacated a death sentence where the defendant killed a store employee, and the single valid ag-gravator was murder in the course of a robbery. Only nonstatutory mitigation was found, including that the defendant was a good parent and provider, exhibited no prior violent propensities, was honorably discharged from the United States Navy, had gainful employment and some artistic skill, was raised in a religious environment, and was a model prisoner. Id. at 826 n. 2; accord Sinclair v. State, 657 So.2d 1138, 1142-43 (Fla.1995) (vacating death sentence for murder of cab driver where single aggravator was murder in the course of robbery/pecuniary gain and three nonstatutory mitigators were found and given little to no weight but record showed mitigation of low intelligence level and emotional disturbances had “substantial weight”).
In the above cases, this Court’s decisions to vacate the death sentences were based on an analysis of the weight of the aggravating and mitigating factors, the supporting evidence, and other relevant circumstances in each case. This Court determined that none of these cases met the essential requirement of being one of the most aggravated and least mitigated of murders. In this case, the trial court accorded great weight to the single, merged aggravator of murder in the course of a robbery/pecuniary gain. Unlike other ag-gravators, such as heinous, atrocious, or cruel (HAC); a prior violent felony conviction; or cold, calculated, and premeditated (CCP), the aggravating factor in this case is not typically considered especially weighty. See Cole v. State, 36 So.3d 597, 610 (Fla.2010) (noting that CCP and prior violent felony conviction are “particularly *552 weighty” aggravators); Larkins v. State, 739 So.2d 90, 95 (Fla.1999) (stating that HAC and CCP are “two of the most serious aggravators set out in the statutory sentencing scheme”).
Moreover, the murder does not appear to have been a part of the pre-arranged robbery plan. Instead, Maida’s death resulted from a perceived threat, which can reasonably be inferred from the events surrounding the crime and is supported by Yacob’s prior experience working in convenience stores, even though this particular evidence was not presented to the jury, that occurred after Yacob pocketed his gun and headed for the store’s exit. As a result, we conclude that the single aggravating factor based on the contemporaneous commission of the robbery is not weighty. Accordingly, having reviewed the record and compared this case to similar capital cases, we hold that death is not a proportionate sentence in this case.
III. CONCLUSION
For the reasons set forth in this opinion, we affirm Yacob’s convictions for first-degree murder and armed robbery with a firearm, but we vacate the sentence of death and remand this case for imposition of a sentence of life imprisonment without the possibility of parole.
It is so ordered.
PARIENTE, QUINCE, and PERRY, JJ., concur.
LABARGA, J., concurs with an opinion.
LEWIS, J., concurs in result only.
CANADY, J., concurs in part and dissents in part with an opinion, in which POLSTON, C.J., concurs.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. We acknowledge, as the dissenting-in-part opinion points out, that the Supreme Court, in Pulley v. Harris, 465 U.S. 37, 50-51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), held that the Eighth Amendment does not require comparative proportionality review by an appellate court in every case in which the death penalty is imposed and the defendant requests proportionality review of the sentence. In Pulley, however, the Supreme Court also proceeded to list the panoply of "checks on arbitrariness” that existed in the California statute being reviewed, including that at least one "special circumstance" must be unanimously found by the jury in order for the case to proceed to a penalty phase and each "special circumstance” must be proven to the jury beyond a reasonable doubt. Id. at 51, 104 S.Ct. 871. Several of the "checks on arbitrariness” identified in Pulley as the kind contemplated by Furman are not present under Florida's capital sentencing system, which is also currently one of the only death penalty statutes in the country to permit a non-unanimous jury recommendation of death.