# Supreme Court of Florida

No. SC18-2061
_____

**JONATHAN HUEY LAWRENCE,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

October 29, 2020

PER CURIAM.

Jonathan Huey Lawrence appeals his sentence of death for the 1998 first-degree murder of Jennifer Robinson that was imposed in a 2018 resentencing proceeding. We have jurisdiction, *see* art. V, § 3(b)(1), Fla. Const., and affirm. As is more fully explained below, although Lawrence's original death sentence was determined to be proportional based on substantially the same evidence presented during the de novo resentencing proceeding at issue, Lawrence argues on appeal that his sentence of death is not proportional. The State argues that this Court is legally prohibited, by the Florida Constitution, from reviewing death sentences for comparative proportionality when that review is not authorized by statute. We agree with the State and hold that the conformity clause of article I, section 17 of

the Florida Constitution forbids this Court from analyzing death sentences for comparative proportionality in the absence of a statute establishing that review.

## BACKGROUND

In 2000, Lawrence pleaded guilty to principal to the first-degree murder of Robinson, conspiracy to commit first-degree murder, giving alcoholic beverages to a person under twenty-one, and abuse of a dead human corpse, and he was sentenced to death for Robinson's murder. *Lawrence v. State*, 846 So. 2d 440, 442 (Fla. 2003). Robinson's murder followed two separate criminal episodes in which Lawrence and his codefendant murdered one individual and attempted to murder another individual. *See id.* at 443 n.3. We detailed the facts of Robinson's murder on direct appeal, explaining that Lawrence and his codefendant, who was also convicted of first-degree murder and sentenced to death for Robinson's murder, carried out their crimes against Robinson in accordance with notes in Lawrence's handwriting:

> Lawrence's codefendant, Jeremiah Martel Rodgers, picked up eighteen-year-old Jennifer Robinson from her mother's home on May 7, 1998. Rodgers and Robinson met Lawrence, and all three drove in Lawrence's truck to a secluded area in the woods. After imbibing alcoholic beverages, Robinson had sex with Rodgers and then with Lawrence. At some point thereafter, Rodgers shot Robinson in the back of the head using Lawrence's Lorcin .380 handgun. The gunshot rendered Robinson instantly unconscious, and she died minutes later. Lawrence and Rodgers loaded Robinson's body into Lawrence's truck and drove further into the woods. Lawrence made an incision into Robinson's leg and removed her calf muscle. Rodgers took Polaroid

- 2 -

pictures of the body, including a picture of Lawrence's hand holding Robinson's foot. Lawrence and Rodgers buried Robinson at that site.

Investigators traced Robinson's disappearance to Lawrence and Rodgers. When confronted by Investigator Todd Hand, Lawrence denied knowing Robinson and consented to Hand's request to search Lawrence's trailer and truck. After recovering multiple notes written by Lawrence and Polaroid photographs depicting Robinson post-mortem, Hand arrested Lawrence. One page of the recovered notes states in part: "get her very drunk," "yell in her ears to check consicouse [sic]," "even slap hard," "[r]ape many, many, many times," " 'slice and dice,' [d]isect [sic] completely," "bag up eatabile [sic] meats," and "bag remains and bury and burn." Another page of notes provides a list of items and tasks, some of which had been checked off or scribbled out. That list includes "coolers of ice = for new meat," strawberry wine, everclear alcohol, scalpels, Polaroid film, and ".380 or-and bowies [knives]." Other items located by investigators during their search of Lawrence's trailer and truck included a box for a Lorcin .380 handgun; empty Polaroid film packages; a piece of human tissue in Lawrence's freezer; a blue and white ice chest; an empty plastic ice bag; disposable gloves; a scrapbook; and several books, including an anatomy book []titled *The Incredible Machine*, within which had been marked female anatomy pages and pen lines drawn at the calf section of a leg. Lawrence subsequently confessed to his involvement, after waiving his *Miranda* [*v. Arizona*, 384 U.S. 436 (1966)] rights, and led detectives to Robinson's body.

*Id.* at 442-43 (footnotes omitted). On direct appeal, Lawrence appealed only his sentence of death, and we affirmed, *id.* at 446, including on the basis that Lawrence's death sentence was proportionate in comparison to other cases in which we have upheld the imposition of the death penalty, *id.* at 452-55.

We subsequently affirmed the denial of Lawrence's initial postconviction motion and denied his habeas petition. *Lawrence v. State*, 969 So. 2d 294, 315 (Fla. 2007).

- 3 -

Thereafter, the trial court granted Lawrence's successive postconviction motion, vacated his death sentence, and ordered a new penalty phase proceeding pursuant to *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *receded from by State v. Poole*, 297 So. 3d 487 (Fla. 2020).

Before the second penalty-phase proceeding, which is at issue here, began, Lawrence sent a handwritten letter to the trial court requesting that his death sentence be "reinstated," stating in pertinent part:

> [M]ay I request to please have my death sentence reinstated? I've never wanted a new trial or anything to do with the *Hurst* hearing/ruleing [sic] and have been trying for ten years to have my last attorney . . . drop all my appeals but he has completely ignored me and refused any form of communications with me until telling me my new attorney's names and that I'm to go . . . for a new sentencing that I do not want. I'm guilty of all my charges and deserve my death sentence. I've had no intention of putting the families, friends and loved ones of the innocent people I deliberately helped murder through all these 20 long years of grief, suffering and loss, to have to indure [sic] more. They deserve justice and every amount of peace my death sentence and conclusion might give them.

Through appointed counsel, Lawrence subsequently moved to waive his rights to a penalty-phase jury, to present mitigation, and to challenge the State's evidence. After inquiring of Lawrence and hearing testimony from a doctor who had evaluated Lawrence and found him competent, the trial court found Lawrence's waivers to be knowing, intelligent, and voluntary. The trial court ordered a presentence investigation and appointed special counsel pursuant to

- 4 -

*Marquardt v. State*, 156 So. 3d 464 (Fla. 2015), to assist it in considering available mitigation.

Thereafter, following the State's penalty-phase presentation and special counsel's presentation at a subsequent hearing that also served as a *Spencer*[1] hearing, the trial court sentenced Lawrence to death, finding that the aggravating circumstances[2] "greatly outweigh" the statutory and nonstatutory mitigating circumstances.[3] In sentencing Lawrence to death, the trial court further found as follows:

---

1. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

2. The trial court found that the State had proven two statutory aggravating circumstances beyond a reasonable doubt and assigned both of them great weight: (1) the defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person; and (2) the murder was committed in a cold, calculated, and premeditated manner.

3. The trial court found and assigned moderate weight to two statutory mitigating circumstances: (1) the capital felony was committed while Lawrence was under the influence of extreme mental or emotional disturbance; and (2) the capacity of Lawrence to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

The trial court also found four nonstatutory mitigating circumstances to which it assigned the noted weight: (1) the defendant told the probation officer that he is mainly guilty and feels like he deserves to die (slight weight); (2) the defendant was raised in an abusive and dysfunctional home (slight weight); (3) the defendant cooperated with the police in locating the scene of the crime and the body (slight weight); and (4) the defendant's history of mental health problems that do not rise to the level of statutory mitigation (moderate weight).

The Court has carefully considered and weighed the aggravating and mitigating circumstances found to exist in this penalty phase. The State has proven beyond and to the exclusion of every reasonable doubt the existence of two serious aggravators. The prior violent felony aggravator was given great weight due to the fact that both prior offenses were committed prior to the murder of Jennifer Robinson, were committed with the co-defendant, Rodgers, and involved murder and attempted murder. Both of these prior crimes were senselessly violent and without any moral or legal justification. They are indicative of the same total disregard for human life evidenced in this case. In each case, Lawrence and Rodgers killed or attempted to kill another human being. In addition, the cold, calculated, and premeditated aggravator was given great weight due to Lawrence's significant involvement in the planning, preparation, and execution of the murder.

The Court finds that these two aggravators greatly outweigh all of the statutory and non-statutory mitigating circumstances, inclusive of the significant mental mitigation.

## ANALYSIS

On appeal, Lawrence argues that his death sentence is disproportionate in comparison to other cases in which the sentence of death has been imposed. The State urges us to recede from precedent holding that we must review the comparative proportionality of every death sentence to "ensure uniformity of sentencing in death penalty proceedings," *Rogers v. State*, 285 So. 3d 872, 891 (Fla. 2019), by reserving the death penalty "for only the most aggravated and least mitigated of first-degree murders." *Id.* at 892 (quoting *Urbin v. State*, 714 So. 2d 411, 416 (Fla. 1998)); *see also* Fla. R. App. P. 9.142(a)(5) (providing that the Court shall review proportionality on direct appeal whether or not the issue is presented by the parties). In support of its argument, the State contends that

- 6 -

comparative proportionality review violates the conformity clause of article I, section 17 of the Florida Constitution. We agree with the State and write to explain why our precedent is erroneous and must yield to our constitution.

**The Florida Constitution Precludes Comparative Proportionality Review**

The conformity clause of article I, section 17 of the Florida Constitution provides that "[t]he prohibition against cruel or unusual punishment, and the prohibition against cruel and unusual punishment, shall be construed in conformity with decisions of the United States Supreme Court which interpret the prohibition against cruel and unusual punishment provided in the Eighth Amendment to the United States Constitution." The Supreme Court has held that comparative proportionality review of death sentences is not required by the Eighth Amendment. *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984) ("There is . . . no basis [in Supreme Court case law] for holding that comparative proportionality review by an appellate court is required in every case in which the death penalty is imposed and the defendant requests it.").

In *Yacob v. State*, 136 So. 3d 539, 546-49 (Fla. 2014), this Court addressed whether our state-law precedent requiring comparative proportionality review survived the addition of the conformity clause to article I, section 17 of the Florida Constitution in 2002. In holding that it did, *Yacob* sourced the requirement for comparative proportionality review from three other provisions of Florida law

- 7 -

outside of article I, section 17.  Specifically, *Yacob* held that comparative proportionality review "flows from Florida's capital punishment statute—section 921.141, Florida Statutes," *Yacob*, 136 So. 3d at 546, from the due process clause of article I, section 9 of the Florida Constitution, *id.* at 549, and from article V, section 3(b)(1) of the Florida Constitution, which grants this Court mandatory, exclusive jurisdiction over appeals from final judgments of trial courts imposing the death penalty, *id.* at 547.  None of these provisions, however, requires the comparative proportionality review that we have held to be required and codified in our procedural rules as within the scope of our appellate review.  *See* Fla. R. App. P. 9.142(a)(5).

Comparative proportionality review is not referenced anywhere in the text of section 921.141, Florida Statutes (2019).  Yet, *Yacob* read this requirement into the portion of the statute which provides that "[t]he judgment of conviction and sentence of death shall be subject to automatic review" by this Court "in accordance with rules adopted by" this Court.  § 921.141(5), Fla. Stat. (2019); *see Yacob*, 136 So. 3d at 546 (quoting then-subsection (4) of the statute for this proposition).  In support of this conclusion, *Yacob* reasoned that this Court had previously "interpreted section 921.141 as including proportionality review of death sentences" in *State v. Dixon*, 283 So. 2d 1, 10 (Fla. 1973).  *Yacob*, 136 So. 3d

at 546. However, *Dixon* did no such thing. Rather, as Justice Canady explained in dissenting from this portion of the *Yacob* decision,

> *Dixon*—which upheld Florida's capital punishment statute against a constitutional challenge—contemplated that in any case where "a defendant is sentenced to die, this Court can review that case in light of the other decisions [imposing sentences of death] and determine whether or not the punishment is too great." 283 So. 2d at 10. The reasoning of *Dixon*, however, does not in any way tie this comparative review to a provision of section 921.141. Instead, the comparative review envisioned by *Dixon* can only reasonably be understood as a *judicial-created means* to ensure that the statute would be implemented in a way that would avoid the constitutional concerns articulated in *Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972), concerns which were rooted in the prohibition on cruel and unusual punishments. The *Dixon* court understood that such comparative review would be consistent with the statute, but that is different from concluding that the statute requires or specifically authorizes comparative proportionality review.

*Yacob*, 136 So. 3d at 561 (Canady, J., concurring in part and dissenting in part).

The *Yacob* Court also relied on our pre-conformity clause decision in *Tillman v. State*, 591 So. 2d 167 (Fla. 1991), which cited two provisions of the Florida Constitution in addition to article I, section 17 as requiring comparative proportionality review. These provisions were the due process clause of article I, section 9, and the provision granting this court mandatory, exclusive jurisdiction over appeals from final judgments of trial courts imposing the death penalty—article V, section (3)(b)(1). *See Yacob*, 136 So. 3d at 547, 549 (citing *Tillman*'s reliance on article V, section 3(b)(1) and article I, section 9 for comparative

proportionality review).  However, neither provision imposes any such requirement

for the reasons Justice Canady explained in dissenting from this portion of *Yacob*:

> *Tillman* states that the "obvious purpose" of our mandatory
> jurisdiction "is to ensure the uniformity of death-penalty law by
> preventing the disagreement over controlling points of law that may
> arise when the district courts of appeal are the only appellate courts
> with mandatory appellate jurisdiction."  [*Tillman*, 591 So. 2d at 169];
> *see* art. V, § 3(b)(1), Fla. Const.  But "preventing the disagreement
> over controlling points of law" does not require comparative
> proportionality review.  Furthermore, the jurisdictional provision is
> purely a matter of procedure; it does nothing to substantively define
> the review undertaken by the court.  *Tillman*'s reliance on this
> jurisdictional provision as a basis for proportionality review is
> untenable.
>
> It is no more tenable to skirt the conformity clause by
> proclaiming that comparative proportionality review is required by the
> due process clause rather than by the prohibition on cruel and unusual
> punishments.  Under the federal Constitution, "the Eighth
> Amendment's Cruel and Unusual Punishments Clause [is] made
> applicable to the States by the Due Process Clause of the Fourteenth
> Amendment."  *Graham* [*v. Florida*, 560 U.S. 48, 53 (2010)].  The
> prohibition on cruel and unusual punishments thus is a particular
> aspect of due process.  And the conformity clause expressly limits the
> authority of this Court with respect to that aspect of due process.  To
> conclude otherwise is to treat the conformity clause as meaningless
> for all practical purposes.

*Yacob*, 136 So. 3d at 561-62 (Canady, J., concurring in part and dissenting in part).

The only legitimate state-law source for comparative proportionality review

was the prohibition against cruel and unusual punishment found in article I, section

17 of the Florida Constitution—*before* the conformity clause was added to that

provision in 2002.  *See Yacob*, 136 So. 3d at 560-61 (Canady, J., concurring in part

and dissenting in part) (summarizing this Court's "repeated reliance on the cruel

- 10 -

and unusual punishments prohibition as the basis for our proportionality review").

Post-conformity clause, we have wrongly continued to enforce a state-law requirement for comparative proportionality review and have wrongly written this requirement into our procedural rules governing the scope of our appellate review. *See Amendments to the Fla. Rules of Appellate Procedure*, 894 So. 2d 202, 204, 218-19 (Fla. 2005) (adding a proportionality review requirement to rule 9.142 to "make the rule consistent with this Court's practice" concerning the scope of its appellate review).

When confronted with the issue in *Yacob*, this Court should have held that a judge-made comparative proportionality review requirement violates article I, section 17 of the Florida Constitution in light of the Supreme Court's precedent establishing that comparative proportionality review is not required by the Eighth Amendment, *see Pulley* 465 U.S. at 50-51. We cannot judicially rewrite our state statutes or constitution to require a comparative proportionality review that their text does not. *See* art. II, § 3, Fla. Const. Nor can we ignore our constitutional obligation to conform our precedent respecting the Florida Constitution's prohibition against cruel and unusual punishment to the Supreme Court's Eighth Amendment precedent by requiring a comparative proportionality review that the Supreme Court has held the Eighth Amendment does not. *See* art. I, § 17, Fla. Const. *Yacob* wrongly did both.

## *Yacob* **Must Yield to the Florida Constitution**

The State argues that we should recede from *Yacob*. We recently explained

"the proper approach to *stare decisis*" as follows:

> In a case where we are bound by a higher legal authority—whether it be a constitutional provision, a statute, or a decision of the Supreme Court—our job is to apply that law correctly to the case before us. When we are convinced that a precedent clearly conflicts with the law we are sworn to uphold, the precedent normally must yield.
>
> We say normally because "*stare decisis* means sticking to some wrong decisions." *Kimble v. Marvel Entertainment, LLC*, 135 S. Ct. 2401, 2409 (2015). "Indeed, *stare decisis* has consequence only to the extent it sustains incorrect decisions; correct judgments have no need for that principle to prop them up." *Id.* But once we have chosen to reassess a precedent and have come to the conclusion that it is clearly erroneous, the proper question becomes whether there is a valid reason *why not* to recede from that precedent.
>
> The critical consideration ordinarily will be reliance. It is generally accepted that reliance interests are "at their acme in cases involving property and contract rights." *Payne v. Tennessee*, 501 U.S. 808, 828 (1991). And reliance interests are lowest in cases . . . "involving procedural and evidentiary rules." *Id.*; *see also Alleyne*, 570 U.S. at 119 (Sotomayor, J., concurring) ("[W]hen procedural rules are at issue that do not govern primary conduct and do not implicate the reliance interests of private parties, the force of *stare decisis* is reduced.").

*Poole*, 297 So. 3d at 507.

Viewing our erroneous decision in *Yacob* through this lens, we fail to find "a

valid reason *why not* to recede from" it. *Poole*, 297 So. 3d at 507. In light of the

Supreme Court's decision in *Pulley*, the conformity clause expressly forecloses this

Court's imposition of a comparative proportionality review requirement that is

- 12 -

predicated on the Eighth Amendment.[4]  The reliance interests of death-sentenced

defendants on this Court's comparative proportionality review are low to

nonexistent, as defendants do not alter their behavior in expectation of such

review.  In contrast, victims and the State have strong interests in this Court's

upholding death sentences obtained in compliance with section 921.141.

Moreover, there is no reason to continue to apply erroneous precedent that,

though well-intentioned,[5] relies on perceived deficiencies in section 921.141 that

do not exist.  *See Yacob*, 136 So. 3d at 549 n.2.  Florida's death penalty statute

---

4.  We note, however, that Florida's conformity clause does not preclude the Legislature from requiring comparative proportionality review of death sentences by statute.  Although the State argued to the contrary in its brief, at oral argument, the State appeared to concede the point that our conformity clause is not so broadly worded as to preclude a statutory requirement for comparative proportionality review.  Indeed, other state legislatures have mandated comparative proportionality review by statute.  *See, e.g.*, *State v. Wood*, 580 S.W.3d 566, 590 (Mo. 2019) (explaining that section 565.035.3., Mo. Rev. Stat., "imposes an independent duty on [the Supreme Court of Missouri] to undertake a proportionality review to determine," among other things, "(3) [w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant").  We express no opinion as to whether the Florida Legislature *should* adopt such a requirement; we simply note that the State is incorrect to the extent it contends that the Florida Legislature *could not* do so.

5.  We recognize our valued colleague's dissent and its argument that reviewing death sentences for comparative proportionality would be good policy. Even were we to agree with the dissent's policy analysis, however, we would still be sworn to follow our constitution—which does not permit the result for which the dissent argues.

- 13 -

comports with due process; it has been amended since *Yacob* to comply with federal and state constitutional requirements regarding death-eligibility, *see* § 921.141(3);[6] it provides adequate safeguards against the arbitrary and capricious imposition of the death penalty; and, since *Yacob*, it has been amended to exceed what the federal and state constitutions require by mandating (in non-jury-waiver cases) that the jury's recommendation for death be unanimous, *see* § 921.141(2)(c).[7]

---

6. *See also McKinney v. Arizona*, 140 S. Ct. 702, 707 (2020) ("Under *Ring* [*v. Arizona*, 536 U.S. 584 (2002),] and *Hurst* [*v. Florida*, 136 S. Ct. 616 (2016)], a jury must find the aggravating circumstance that makes the defendant death eligible.  But importantly, in a capital sentencing proceeding, just as in an ordinary sentencing proceeding, a jury (as opposed to a judge) is not constitutionally required to weigh the aggravating and mitigating circumstances or to make the ultimate decision within the relevant sentencing range."); *Poole*, 297 So. 3d at 507 ("reced[ing] from *Hurst v. State* except to the extent it requires a jury unanimously to find the existence of a statutory aggravating circumstance beyond a reasonable doubt").

7. *See also Poole*, 297 So. 3d at 504 ("[T]he Sixth Amendment, as interpreted in *Spaziano* [*v. Florida*, 468 U.S. 447, 465 (1984)], does not require any jury recommendation of death, much less a unanimous one. . . .  [W]e further erred in *Hurst v. State* when we held that the Eighth Amendment requires a unanimous recommendation of death.  The Supreme Court rejected that exact argument in *Spaziano*."); *id.* at 505 (holding that *Hurst v. State* erred in concluding that a unanimous jury recommendation is required by article I, section 22 of the Florida Constitution governing the right to a jury trial, and further holding that "our state constitution's prohibition on cruel and unusual punishment, article I, section 17, does not require a unanimous recommendation—or any jury recommendation—before a death sentence can be imposed" (footnote omitted)).

Accordingly, we recede from *Yacob*'s requirement to review death sentences for comparative proportionality and thus eliminate comparative proportionality review from the scope of our appellate review set forth in rule 9.142(a)(5).

**CONCLUSION**

For the foregoing reasons, we decline to review Lawrence's claim that his death sentence is disproportionate and affirm his sentence of death.[8]

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, MUÑIZ, and COURIEL, JJ., concur.
LABARGA, J., dissents with an opinion.
GROSSHANS, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

---

8. We note that, in addition to challenging the proportionality of his death sentence, Lawrence raises the meritless claim that the trial court fundamentally erred in sentencing him to death because it did not determine beyond a reasonable doubt the sufficiency of the aggravating factors and whether they outweighed the mitigating circumstances. We have repeatedly rejected this claim in cases where the defendant did not waive the right to a penalty-phase jury. *See Newberry v. State*, 288 So. 3d 1040, 1047 (Fla. 2019) (rejecting fundamental-error claim because the sufficiency and weighing determinations "are not subject to the beyond a reasonable doubt standard of proof") (citing *Rogers*, 285 So. 3d at 886). The same fundamental-error claim is equally meritless in this case, where Lawrence waived the right to a penalty-phase jury. *See* § 921.141(3)(b), Fla. Stat. (2018) (subjecting only the trial court's finding of the existence of at least one aggravating factor to the beyond a reasonable doubt standard of proof); *see also supra* note 6.

- 15 -

LABARGA, J., dissenting.

Today, the majority takes the most consequential step yet in dismantling the reasonable safeguards contained within Florida's death penalty jurisprudence—a step that eliminates a fundamental component of this Court's mandatory review in direct appeal cases.

## The Majority's Recent Decisions in Context

I cannot overstate how quickly and consequentially the majority's decisions have impacted death penalty law in Florida. On January 23, 2020, this Court decided *State v. Poole*, 297 So. 3d 487 (Fla. 2020). As I noted in my dissent in *Poole*, despite the clearly defined historical basis for requiring unanimous jury verdicts in Florida, this Court receded from the requirement that juries must unanimously recommend that a defendant be sentenced to death. *Poole*, 297 So. 3d at 513 (Labarga, J., dissenting). After 2016, only the state of Alabama permitted a nonunanimous (10-2) jury recommendation.[9] *Poole* paved the way for Florida to return to an absolute outlier status of being one of only two states that does not require unanimity.

On May 14, 2020, this Court decided *Bush v. State*, 295 So. 3d 179 (Fla. 2020). In that case, this Court uprooted the long applied heightened standard of

_____

9. Ala. Code § 13A-5-46(f) (2020).

- 16 -

review in cases that are wholly based on circumstantial evidence. Under the heightened standard, "[e]vidence which furnishes nothing stronger than a suspicion, even though it would tend to justify the suspicion that the defendant committed the crime, it is not sufficient to sustain [a] conviction. It is the actual exclusion of the hypothesis of innocence which clothes circumstantial evidence with the force of proof sufficient to convict." *Davis v. State*, 90 So. 2d 629, 631-32 (Fla. 1956). This standard, applied for more than one hundred years, served as an important check on circumstantial evidence cases. As I noted in my dissent in *Bush*, while circumstantial evidence is a vital evidentiary tool in meeting the State's burden of proof, "circumstantial evidence is inherently different from direct evidence in a manner that warrants heightened consideration on appellate review." *Bush*, 295 So. 3d at 216 (Fla. 2020) (Labarga, J., concurring in part and dissenting in part). "The solemn duty imposed upon this Court in reviewing death cases more than justifies the stringent review that has historically been applied in cases based solely on circumstantial evidence." *Id.* at 217.

On May 21, 2020, this Court decided *Phillips v. State*, 299 So. 3d 1013 (Fla. 2020). In *Phillips*, this Court receded from *Walls v. State*, 213 So. 3d 340 (Fla. 2016) (holding that *Hall v. Florida*, 572 U.S. 701 (2014), is to be retroactively applied). The United States Supreme Court's decision in *Hall* held that Florida law, which barred individuals with an IQ score above 70 from demonstrating that

- 17 -

they were intellectually disabled, "creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional." *Id.* at 704. The Supreme Court concluded: "This Court agrees with the medical experts that when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability, including testimony regarding adaptive deficits." *Id.* at 723. In *Walls*, this Court held that *Hall* is to be retroactively applied. The majority's recent decision in *Phillips* subsequently receded from *Walls*.

As expressed in my dissent in *Phillips*, in light of the majority's decision to recede from *Walls*, "an individual with significant deficits in adaptive functioning, and who under a holistic consideration of the three criteria for intellectual disability could be found intellectually disabled, is completely barred from proving such because of the timing of his legal process. This arbitrary result undermines the prohibition of executing the intellectually disabled." *Phillips*, 299 So. 3d at 1025 (Labarga, J., dissenting).

In each of these cases, I dissented, and I lamented the erosion of our death penalty jurisprudence. Now today, the majority jettisons a nearly fifty-year-old pillar of our mandatory review in direct appeal cases. As a result, no longer is this Court required to review death sentences for proportionality. I could not dissent more strongly to this decision, one that severely undermines the reliability of this

- 18 -

Court's decisions on direct appeal, and more broadly, Florida's death penalty jurisprudence.

## Mandatory Review in Death Cases

Until today, this Court has for decades carried out its solemn responsibility to evaluate each death sentence for both the sufficiency of the evidence on which the State relied to convict the defendant, and the proportionality of the death sentence when compared with other cases. We have consistently explained: "In death penalty cases, this Court conducts an independent review of the sufficiency of the evidence." *Caylor v. State*, 78 So. 3d 482, 500 (Fla. 2011) (citing *Phillips v. State*, 39 So. 3d 296, 308 (Fla. 2010)). Whether the evidence is sufficient is judged by whether it is competent and substantial. *See Blake v. State*, 972 So. 2d 839, 850 (Fla. 2007). "In conducting this review, we view the evidence in the light most favorable to the State to determine whether a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." *Rodgers v. State*, 948 So. 2d 655, 674 (Fla. 2006) (citing *Bradley v. State*, 787 So. 2d 732, 738 (Fla. 2001)).

Moreover, "[i]n capital cases, this Court compares the circumstances presented in the appellant's case with the circumstances of similar cases to determine whether death is a proportionate punishment." *Caylor*, 78 So. 3d at 498 (citing *Wade v. State*, 41 So. 3d 857, 879 (Fla. 2010)). "In deciding whether death

is a proportionate penalty, 'we make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.' " *Offord v. State*, 959 So. 2d 187, 191 (Fla. 2007) (quoting *Anderson v. State*, 841 So. 2d 390, 407-08 (Fla. 2003)). "This entails 'a *qualitative* review . . . of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.' " *Id.* (quoting *Urbin v. State*, 714 So. 2d 411, 416 (Fla. 1998)).

"[P]roportionality review in death cases rests at least in part on the recognition that death is a uniquely irrevocable penalty, requiring a more intensive level of judicial scrutiny or process than would lesser penalties." *Tillman v. State*, 591 So. 2d 167, 169 (Fla. 1991). In fact, the sufficiency of the evidence and the proportionality analyses are so fundamental to this Court's direct appeal review that they are conducted regardless of whether the defendant challenges sufficiency and proportionality on direct appeal. *See* Fla. R. App. P. 9.142(a)(5) ("On direct appeal in death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief.").

This Court first recognized the doctrine of proportionality in 1973 in *State v. Dixon*, 283 So. 2d 1, 10 (Fla. 1973), *superseded on other grounds by* ch. 74-383,

§ 14, Laws of Fla., *as stated in State v. Dene*, 533 So. 2d 265, 267 (Fla. 1988), in which this Court explained:

> It must be emphasized that the procedure to be followed by the trial judges and juries is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment as to what factual situations require the imposition of death and which can be satisfied by life imprisonment in light of the totality of the circumstances present. Review by this Court guarantees that the reasons present in one case will reach a similar result to that reached under similar circumstances in another case. No longer will one man die and another live on the basis of race, or a woman live and a man die on the basis of sex. If a defendant is sentenced to die, this Court can review that case in light of the other decisions and determine whether or not the punishment is too great. Thus, the discretion charged in *Furman v. Georgia* . . . can be controlled and channeled until the sentencing process becomes a matter of reasoned judgment rather than an exercise in discretion at all.

In the decades since *Dixon*, a robust body of case law, consisting of literally hundreds of cases, has reaffirmed this rationale and continually strengthened the reliability of this Court's proportionality review.

While the overwhelming majority of this Court's death penalty cases are upheld on proportionality grounds, the fact that this Court has reversed death sentences due to a lack of proportionality underscores the need for proportionality review. *See, e.g., McCloud v. State*, 208 So. 3d 668 (Fla. 2016); *Phillips v. State*, 207 So. 3d 212 (Fla. 2016); *Yacob v. State*, 136 So. 3d 539 (Fla. 2014); *Scott v. State*, 66 So. 3d 923 (Fla. 2011); *Crook v. State*, 908 So. 2d 350 (Fla. 2005); *Williams v. State*, 707 So. 2d 683 (Fla. 1998); *Jones v. State*, 705 So. 2d 1364 (Fla.

1998); *Voorhees v. State*, 699 So. 2d 602 (Fla. 1997); *Curtis v. State*, 685 So. 2d 1234 (Fla. 1996); *Sinclair v. State*, 657 So. 2d 1138 (Fla. 1995).  Yet, I emphasize that not only is the reversal of a death sentence on proportionality grounds a rare occurrence, when a death sentence is reversed as disproportionate, the result is not a "get out of jail free" card.  It means that the death penalty is not a proportionate punishment in a particular case, and that instead, the statutory maximum punishment for first-degree murder, a sentence of life imprisonment, is what the law requires.

Today's decision by the majority, striking proportionality review from this Court's mandatory review in death penalty appeals, leaves only the sufficiency analysis.  In removing this fundamental component of proportionality review, the majority's decision threatens to render this Court's initial review of death sentences an exercise in discretion.

**Proportionality Review is Consistent with the Eighth Amendment**

"The concept of proportionality is central to the Eighth Amendment." *Graham v. Florida*, 560 U.S. 48, 59 (2011).  Contrary to the conclusion reached by the majority, I view this Court's lengthy history of conducting proportionality review as entirely consistent with the Eighth Amendment as interpreted by the United States Supreme Court, and thus, not a violation of the conformity clause contained in article I, section 17 of the Florida Constitution.  Even though the

United States Supreme Court concluded in *Pulley v. Harris*, 465 U.S. 37 (1984), that proportionality review was not constitutionally mandated, the Supreme Court acknowledged proportionality review as "an additional safeguard against arbitrarily imposed death sentences." *Id.* at 50.

Thus, I disagree with the majority's reasoning that because the Supreme Court does not expressly mandate proportionality review, Florida's conformity clause forbids it. The Supreme Court recognized proportionality review as an "additional safeguard" against the very thing the Eighth Amendment prohibits—arbitrarily imposed death sentences. As observed by Justice Brennan in his dissent in *Pulley*:

> Disproportionality among sentences given different defendants can only be eliminated after sentencing disparities are identified. And the most logical way to identify such sentencing disparities is for a court of statewide jurisdiction to conduct comparisons between death sentences imposed by different judges or juries within the State. This is what the Court labels comparative proportionality review. Although clearly no panacea, such review often serves to identify the most extreme examples of disproportionality among similarly situated defendants. At least to this extent, this form of appellate review serves to eliminate some of the irrationality that currently surrounds imposition of a death sentence. If only to further this limited purpose, therefore, I believe that the Constitution's prohibition on the irrational imposition of the death penalty requires that this procedural safeguard be provided.

*Pulley*, 465 U.S. at 70-71 (Brennan, J., dissenting) (citation omitted).

The United States Supreme Court's acknowledgment of proportionality as an additional safeguard—combined with the fact that the Supreme Court has not

- 23 -

held proportionality review unconstitutional—affirms that in this case, the majority could well have concluded that proportionality does not run afoul of the conformity clause. Instead, yet again placing Florida outside of the majority of death penalty states, the majority has chosen to construe the United States Supreme Court's reasoning as prohibiting Florida's decades old proportionality review. I could not disagree more.

**Proportionality Review in Other States**

Further supporting my conclusion that the majority's decision is a highly unfortunate departure from settled law is the fact that proportionality review is conducted in a majority of other death penalty states. Twenty-five states currently impose the death penalty.[10] Sixty percent of those twenty-five states, not including Florida, conduct a proportionality review. In fourteen of those states, the review is statutorily imposed: Alabama, Georgia, Kentucky, Louisiana, Mississippi,

---

10. The list of death penalty states, which does not include three states with a gubernatorial moratorium (California, Oregon, and Pennsylvania), is as follows: Alabama, Arizona, Arkansas, Florida, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Montana, Nebraska, Nevada, North Carolina, Ohio, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, Virginia, and Wyoming. *See* Death Penalty Information Center, *State by State*, https://deathpenaltyinfo.org/state-and-federal-info/state-by-state (last visited May 20, 2020).

Missouri, Montana, Nebraska, North Carolina, Ohio, South Carolina, South

Dakota, Tennessee, and Virginia.[11]

Similar to Florida (prior to today's decision), appellate review of death

sentences in Utah involves a proportionality review despite the lack of a statutory

requirement. *State v. Honie*, 57 P.3d 977, 988 (Utah 2002) ("Despite the fact that

proportionality review is not required, either by the Utah or federal constitutions or

by statute, we have chosen to assume the responsibility of reviewing death

---

11. Ala. Code § 13A-5-53(b)(3) (2020); *Petric v. State*, 157 So. 3d 176, 250 (Ala. Crim. App. 2013); Ga. Code Ann. § 17-10-35(c)(3) (West 2020); *Willis v. State*, 820 S.E.2d 640, 650 (Ga. 2018); Ky. Rev. Stat. Ann. § 532.075(3)(c) (West 2020); *White v. Commonwealth*, 544 S.W.3d 125, 155 (Ky. 2018), 139 S. Ct. 532 (2019), *abrogated by Woodall v. Commonwealth*, 563 S.W.3d 1 (Ky. 2018); La. Code Crim. Proc. Ann. art. 905.9 (2019); La. Sup. Ct. Gen. Admin. R. XXVIII § 1(c); *State v. Burrell*, 561 So. 2d 692, 711 (La. 1990); *State v. Kyles*, 513 So. 2d 265, 276 (La. 1987); Miss. Code Ann. § 99-19-105(3)(c) (2020); *Ambrose v. State*, 254 So. 3d 77, 151 (Miss. 2018), *cert. denied*, 139 S. Ct. 1379 (2019); Mo. Rev. Stat. § 565.035.3(3) (2019); *State v. Collings*, 450 S.W.3d 741, 767 (Mo. 2014); *State v. Deck*, 303 S.W.3d 527, 550 (Mo. 2010); Mont. Code Ann. § 46-18-310 (2019); *State v. Smith*, 931 P.2d 1272, 1283-84 (Mont. 1996); Neb. Rev. Stat. Ann. §§ 29-2521.01-29-2521.04 (West 2020); *State v. Schroeder*, 941 N.W.2d 445, 470 (Neb. 2020); N.C. Gen. Stat. § 15A-2000(d)(2) (West 2019); *State v. McNeill*, 813 S.E.2d 797, 838-39 (N.C. 2018), *cert. denied*, 139 S. Ct. 1292 (2019); Ohio Rev. Code Ann. § 2929.05(A) (West 2020); *State v. Myers*, 114 N.E.3d 1138, 1185 (Ohio 2018), *cert. denied*, 139 S. Ct. 822 (2019); S.C. Code Ann. § 16-3-25(C)(3) (2020); *State v. Inman*, 720 S.E.2d 31, 46 (S.C. 2011); S.D. Codified Laws § 23A-27A-12(3) (2020); *State v. Piper*, 842 N.W.2d 338, 347-48 (S.D. 2014); Tenn. Code Ann. § 39-13-206(c)(1)(D) (West 2020); *State v. Jones*, 568 S.W.3d 101, 141 (Tenn. 2019), *cert. denied*, 140 S. Ct. 262 (2019); Va. Code Ann. § 17.1-313(C)(2), (E) (West 2020); *Lawlor v. Commonwealth*, 738 S.E.2d 847, 894-95 (Va. 2013).

sentences for disproportionality."); *State v. Wood*, 648 P.2d 71, 77 (Utah 1982) ("In the penalty phase, it is our duty to determine whether the sentence of death resulted from error, prejudice or arbitrariness, or was disproportionate."); *see also State v. Maestas*, 299 P.3d 892, 987 (Utah 2012); *State v. Andrews*, 574 P.2d 709, 710-11 (Utah 1977); *State v. Pierre*, 572 P.2d 1338, 1345 (Utah 1977).

The Utah Supreme Court has emphasized that a proportionality review "means that this Court will not allow sentencing authorities to impose the death penalty in an invidious fashion against particular types of persons or groups of persons or in a fashion disproportionate to the culpability in a particular case . . . that over time, as this Court becomes aware of a general pattern in the imposition of the death penalty in this state, the Court may set aside death sentences that fall outside the general pattern and thus reflect an anomaly in the imposition of the death penalty." *State v. Holland*, 777 P.2d 1019, 1025-26 (Utah 1989). The court stated that this review function "substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Pierre*, 572 P.2d 1338, 1345 (Utah 1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 206 (1976)).

Even in states that statutorily mandate proportionality review, several state supreme courts have emphasized its importance. The Supreme Court of Virginia explained: "The purpose of our comparative [proportionality] review is to reach a

reasoned judgment regarding what cases justify the imposition of the death penalty. We cannot insure complete symmetry among all death penalty cases, but our review does enable us to identify and invalidate a death sentence that is 'excessive or disproportionate to the penalty imposed in similar cases.' " *Orbe v. Commonwealth*, 519 S.E.2d 808, 817 (Va. 1999) (quoting Va. Code Ann. § 17.1-313(C)(2)); *see also Lawlor v. Commonwealth*, 738 S.E.2d 847, 894-95 (Va. 2013).

Similarly, the Tennessee Supreme Court has recognized that "the purposes of comparative proportionality review are to eliminate the possibility that a person will be sentenced to death by the action of an aberrant jury and to guard against the capricious or random imposition of the death penalty," and that "comparative review of capital cases insures rationality and consistency in the imposition of the death penalty." *State v. Bland*, 958 S.W.2d 651, 665 (Tenn. 1997) (citing *State v. Barber,* 753 S.W.2d 659, 665-66 (Tenn. 1988)); *see also State v. White*, 565 S.E.2d 55, 68 (N.C. 2002) (recognizing that "[p]roportionality review also acts '[a]s a check against the capricious or random imposition of the death penalty.' " (quoting *State v. Barfield*, 259 S.E.2d 510, 544 (N.C. 1979))); *State v. Ramsey*, 864 S.W.2d 320, 328 (Mo. 1993) (stating that proportionality review "is designed by the legislature as an additional safeguard against arbitrary and capricious sentencing and to promote evenhanded, rational and consistent imposition of death

sentences."); *State v. Kyles*, 513 So. 2d 265, 276 (La. 1987) (stating that although not constitutionally required, the court "conducts a proportionality review as a further safeguard against arbitrariness").

Without proportionality review, each death sentence stands on its own. Failing to consider a death sentence in the context of other death penalty cases impairs the reliability of this Court's decision affirming that sentence.

**Conclusion**

In line with a vision consistent with evolving standards of decency, as envisioned by the United States Supreme Court in *Trop v. Dulles*, 356 U.S. 86, 101 (1958), our state's jurisprudence has in many instances provided its citizenry with greater rights and protections than the minimum required by the United States Supreme Court, the federal government, and other states. In this instance, our state has consistently done just that, by requiring a proportionality review in every death penalty case, thus providing "an additional safeguard against arbitrarily imposed death sentences." *Pulley*, 465 U.S. at 50. As noted earlier, sixty percent of the twenty-five states that currently impose the death penalty require a proportionality review.

Sadly, this long-standing jurisprudential approach has been significantly, if not completely, repudiated by this Court's various opinions, beginning with its decision in *Poole*, followed by *Bush* and *Phillips*, and continuing with today's

decision to discontinue conducting a proportionality analysis in each death penalty appeal.

I deeply, regretfully, and most respectfully dissent.

An Appeal from the Circuit Court in and for Santa Rosa County,
David Rimmer, Judge - Case No. 571998CF000270XXAXMX

Andy Thomas, Public Defender, and Barbara J. Busharis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida,

for Appellant

Ashley Moody, Attorney General, and Charmaine M. Millsaps, Senior Assistant Attorney General, Tallahassee, Florida,

for Appellee